FRIEDMAN, Senior Circuit Judge.
The question on the merits is whether money remitted to the Internal Revenue Service (the Service) constituted a “deposit” or a “payment” of taxes. If a deposit, the taxpayer is entitled to recover it; if a payment, the taxpayer can recover the money only after it files a claim with the Service for the return of an “overpayment.” The Court of Federal Claims held that it had jurisdiction over this suit for recovery of the remitted money and that the remittance was a deposit, which the taxpayer was entitled to recover. We affirm both rulings.
I.
In computing its taxable income for 1987, the appellee New York Life Insurance Company (N.Y.Life or the Company) used a negative recomputed differential earnings rate (negative rate). Under section 809(a) of the Internal Revenue Code (the Code), 26 U.S.C. § 809(a) (1994), the “differential earnings amount” is the amount by which mutual life insurance companies must reduce the deductions for dividends to policy holders authorized by section 808 of the Code. The differential earnings amount is determined by multiplying the differential earnings rate by the life insurance company’s equity base. Id.; see American Mut. Life Ins. Co. v. United States, 43 F.3d 1172 (8th Cir.1994) (analyzing and clarifying the complex financial calculations involved in section 809), cert. denied, — U.S. —, 116 S.Ct. 335, 133 L.Ed.2d 234 (1995). The Company’s use of the negative rate generated a net operating loss for 1987, which NYLife carried back to 1984.
*1555 Upon audit, the Service proposed adjustments for 1984, 1985, 1986 and 1987, including a disallowance of the 1987 loss (resulting from use of the negative rate), because a negative rate was not allowable. The effect was to increase the Company’s taxable income for that year and thereby eliminate the loss carried back to 1984, resulting in a tax increase of $19,386,791 for 1984. In August, 1992, the Service sent NYLife a notice of adjustment of 1984, 1985, 1986, and 1987 taxes (a thirty-day letter). NYLife protested the proposed adjustments, and the Service reviewed the matter further.
During the review period, NYLife executed an extension of time for assessing the 1987 tax to September 30, 1994, which also extended the time for assessing the 1984 proposed deficiency resulting from the elimination of the loss carried back to that year. See 26 U.S.C. § 6501(h) (1994). In November, 1993, NYLife and the Service reached a tentative settlement for both 1984 and 1987 (and for two other years), under which the Company would pay the deficiency but retain the right to prosecute a refund claim.
On December 17, 1993, NYLife sent the Service three checks “in payment of additional income tax and interest accrued thereon for the tax years” 1984, 1986 and 1987. The check for 1984 was for $31,912,823, of which NYLife requested that $19,374,668 be allocated to additional tax and the balance of $12,-538,155 to interest on that additional tax. The Company stated that the portion of the payment representing the additional tax “is based on a tentative settlement” with the Service.
In March and May, 1994, NYLife submitted to the Service executed forms waiving restrictions on assessment for the years the proposed settlement covered, and stating the terms of the settlement. In those forms the Company “reserve[d] the right to timely file claims for refund or credit or to prosecute timely filed claims for the years 1984, 1986, 1987 and 1988” on specified grounds, including that it was “entitled to the allowance for 1984 of a net operating loss carryback ... attributable to a net operating loss which arises in 1987.” The forms’ cover letters stated: “[T]he Company reserves the right to claim a refund of tax with respect to two issues, the negative recomputed DER----”
Although the Service timely assessed deficiencies for at least NYLife’s 1987 taxes, it never assessed any deficiency for 1984. On September 30, 1994, the statute of limitations on making that assessment expired.
NYLife’s complaint in the Court of Federal Claims, filed October 31, 1994, sought recovery of the $31,912,823 it had remitted to the Service to cover the asserted tax deficiency (plus interest) for 1984, resulting from the Service’s disallowance of the 1987 negative rate. On cross-motions for summary judgment, the court denied the government’s motion, granted the plaintiffs motion and entered judgment for the plaintiff of $31,912,-823 with no interest.
The court held that under Cohen v. United, States, 995 F.2d 205 (Fed.Cir.1993) (discussed in part III, below), the money NYLife had remitted to the Service constituted a deposit, and not a payment, of tax which the plaintiff was entitled to recover. The court rejected the government’s contention that the court lacked jurisdiction because NYLife had not filed a refund claim before filing suit. It held that the refund claim provision, 26 U.S.C. § 7422(a) (1994) (discussed in part II below), upon which the government relied, was inapplicable to NYLife’s remittance because NYLife sought “recovery of a remitted deposit rather than a refund of taxes paid,” a claim which the court ruled was outside the scope of that provision.
II.
A. NYLife invoked the jurisdiction of the Court of Federal Claims under the Tucker Act, 28 U.S.C. § 1491, which gives that court
jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.
28 U.S.C. § 1491(a)(1) (1994).
“The Tucker Act, of course, is itself only a jurisdictional statute; it does not cre *1556 ate any substantive right enforceable against the United States for money damages.” United States v. Testan, 424 U.S. 392, 398, 96 S.Ct. 948, 953, 47 L.Ed.2d 114 (1976). In Eastport S.S. Corp. v. United States, 178 Ct.Cl. 599, 372 F.2d 1002 (1967), the Court of Claims, in discussing the Tucker Act (which then was that court’s jurisdictional font), stated:
But it is not every claim involving or invoking the Constitution, a federal statute, or a regulation which is cognizable here. The claim must, of course, be for money. Within that sphere, the non-contractual claims we consider under Section 1491 can be divided into two somewhat overlapping classes — those in which the plaintiff has paid money over to the Government, directly or in effect, and seeks return of all or part of that sum; and those demands in which money has not been paid but the plaintiff asserts that he is nevertheless entitled to a payment from the treasury. In the first group (where money or property has been paid or taken), the claim must assert that the value sued for was improperly paid, exacted, or taken from the claimant in contravention of the Constitution, a statute, or a regulation.
Id. 372 F.2d at 1007 (footnote omitted).
The court further stated that “[mjonetary claims which cannot be brought within these limits are beyond this court’s jurisdiction, even though they may intimately involve the Constitution, an Act of Congress, or an executive regulation.” Id. at 1008 (footnote omitted).
In Testan, the Supreme Court apparently approved the Court of Claims’ assertion of its jurisdiction over claims seeking return of money paid to the government. In holding that the Court of Claims did not have jurisdiction over a suit by federal civil service employees seeking reclassification of their positions to a higher grade and back pay for the differential in pay between the two grades, the Court pointed out that because the employees
do not rest their claims upon a contract [or] seek the return of money paid by them to the Government [i]t follows that the asserted entitlement to money damages depends on whether any federal statute “can fairly be interpreted as mandating compensation by the Federal Government for the damage sustained.”
Testan, 424 U.S. at 400, 96 S.Ct. at 954 (quoting Eastport, 372 F.2d at 1009). The Court reiterated that principle on the next page when it stated: “Where the United States is the defendant and the plaintiff is not suing for money improperly exacted or retained, the basis of the federal claim ... does not create a cause of action for money damages unless, as the Court of Claims has stated, that basis,” which was followed by the “can fairly be interpreted” language quoted above. Testan, 424 U.S. at 401-02, 96 S.Ct. at 955. These two statements appear to reflect the Supreme Court’s approval of the Eastport statement that the Court of Claims had jurisdiction over suits seeking the return of money improperly paid to, exacted or retained by the government.
In the present case, NYLife sought “the return of money paid by [it] to the Government” in connection with a tentative settlement of the government’s claim that it owed additional taxes for 1984. The Company contended that its use of the negative rate for 1987 was permissible under section 809 of the Internal Revenue Code, and that the government’s disallowance of the 1984 carryback loss was improper. In the language of East-port, NYLife’s claim in the Court of Federal Claims “assert[ed] that the value sued for [the amount remitted] was improperly paid [or] exacted ... in contravention of ... a statute [namely, 26 U.S.C. 809].” “The claim is based on the allegedly erroneous interpretation of a statute by the agency.” Aerolineas Argentinas v. United States, 77 F.3d 1564, 1579-80 (Fed.Cir.1996) (Nies, J. concurring). The complaint accordingly stated a claim over which the Court of Federal Claims had jurisdiction.
The Code does not deal with deposits of taxes or provide procedures for their making or recovery. The concept of a “deposit” of taxes, which is not a payment, stems from the Supreme Court’s decision in Rosenman v. United States, 323 U.S. 658, 65 S.Ct. 536, 89 L.Ed. 535 (1945). There the executors of an estate delivered to the Service a check “as *1557 a payment on account of the Federal Estate tax____ This payment is made under protest and duress, and solely for the purpose of avoiding penalties and interest, since it is contended by the executors that not all of this sum is legally or lawfully due.” Id. at 660, 65 S.Ct. at 537. The Supreme Court rejected the government’s contention that this remittance was a tax “payment,” and ruled that the money was “held not as taxes duly collected are held but as a deposit made in the nature of a cash bond for the payment of taxes thereafter found to be due.” Id. at 662, 65 S.Ct. at 538. The Court stated that
the true nature of an arrangement such as this [is] to treat it as an estimated deposit and not as a payment which, if in excess of what should properly have been exacted, entitled the taxpayer to interest as the return on the use that the Government has had of moneys that should not have been exacted.
Id. at 663, 65 S.Ct. at 538.
Since that time the courts consistently have recognized that a remittal of money against an assessed or likely tax liability may, depending upon the circumstances, constitute either a payment or a deposit of taxes and that, if the latter, the taxpayer is entitled to its return. See, e.g., Moran v. United States, 63 F.3d 663, 665-66 (7th Cir.1995) (discussing the cases dealing with the deposiVpayment dichotomy, holding that the particular remittance a taxpayer had made was a payment rather than a deposit, and stating that the court “disagree[d] with the implications of the Federal Circuit’s conclusion in Cohen that the decision to dispute a liability necessarily signifies an intent not to make a payment on that liability.” Id. at 669 (footnote omitted)).
Here, as shown above, NYLife sought the return of money it had remitted to the Service, pursuant to a tentative settlement with the Service, of the Company’s tax liability under section 809 of the Code. In the suit NYLife necessarily contended that the money was “improperly paid [or] exacted ... in contravention of ... a statute,” Eastport, 372 F.2d at 1007, because it did not owe the money. If, as we hold in part III, the money was a deposit, NYLife may maintain a Tucker Act suit in the Court of Federal Claims for its recovery.
The dissent denigrates the statements in Eastport on which we rely by repeatedly calling them dicta. However one describes them, they were not something casually tossed off, but were an integral and important part of the Court of Claims’ attempt in that case to summarize and restate the established principles governing its Tucker Act jurisdiction. The court’s jurisdictional discussion in Eastport was intended to provide the standards and guidelines that the Court of Claims followed. As such, even though some aspects of the analysis may be characterized as dictum rather than holding, it is appropriate to follow and apply the stated principles in determining the jurisdiction of the Court of Federal Claims under the Tucker Act. Courts frequently and properly cite and rely upon dicta that correctly set forth governing or relevant legal principles.
The dissent argues that sovereign immunity precludes the Court of Federal Claims from entertaining NYLife’s suit. The dissent states that the “United States, as sovereign, is immune from suit unless it expressly waives its immunity”; that in 28 U.S.C. § 1346, discussed below, Congress has “provided a clear remedy to recover taxes paid without legal basis”; and that because there is no statute expressly waiving sovereign immunity for a suit to recover money deposited to cover an asserted tax deficiency, sovereign immunity bars this suit.
In the Tucker Act Congress gave the Court of Federal Claims “jurisdiction to render judgment upon any claim against the United States” within the categories there specified. In authorizing that court to enter judgment against the United States, Congress waived sovereign immunity for those “claims” that the statute enables the court to entertain. See United States v. Mitchell, 463 U.S. 206, 215-16, 103 S.Ct. 2961, 2966-67, 77 L.Ed.2d 580 (1983) (explaining that “[f]or decades this Court consistently interpreted the Tucker Act as having provided the consent of the United States to be sued eo nomine for the classes of claims described in the Act” and noting that although in Testan “this Court employed language suggesting *1558 that the Tucker Act does not effect a waiver of sovereign immunity” such “isolated language should be disregarded.”) The question therefore is not whether Congress has waived sovereign immunity for a suit to recover a deposit of taxes, but whether a plaintiff who has made such a deposit has a “substantive right enforceable against the United States for money damages.” Testan, 424 U.S. at 398, 96 S.Ct. at 953. Eastport teaches that where the claim is that money “was improperly paid, exacted or taken from the claimant in contravention of ... a statute [here section 809 of the Code],” the Court of Federal Claims may entertain the suit. Eastport, 372 F.2d at 1007. As we have explained that is precisely the situation here.
B. The government contends, however, that NYLife’s failure to file with it a claim for refund of the amount remitted barred the Court of Federal Claims from exercising its jurisdiction to adjudicate NYLife’s claims for recovery of the remittance. It relies upon section 7422(a) of the Code, which provides:
§ 7422. Civil actions for tax refund (a) No suit prior to filing claim for refund No suit or proceeding shall be maintained in any court for the recovery of any internal revenue tax alleged to have been erroneously or illegally assessed or collected, or of any penalty claimed to have been collected without authority, or of any sum alleged to have been excessive or in any manner wrongfully collected, until a claim for refund or credit has been duly filed with the Secretary____
26 U.S.C. § 7422 (1994).
In Schenley Import Corp. v. United States, 129 Ct.Cl. 327, 121 F.Supp. 646 (1953), liquor importers remitted money to the United States to secure the payment of customs duties and taxes before they were due. The importers remitted more money than it turned out they actually owed. When they sued to recover the excess, the government argued that their failure to file a timely refund claim barred recovery under section 3313 of the Code, which contained the identical operative language as present section 7422: “internal revenue tax alleged to have been erroneously or illegally assessed, or of any penalty claimed to have been collected without authority, or of any sum alleged to have been excessive or in any manner wrongfully collected.”
The Court of Claims rejected the government’s contention. It stated:
We do not think that the funds here in question fit the language of the statute. They were money deposited with the Government for its security to create a fund out of which taxes could be paid as they came due. The taxes were paid out of it and the Government owed the rest of it to the plaintiffs, not as an excess collection of taxes or penalties, but as money not required to pay the plaintiffs’ taxes____
Schenley, 121 F.Supp. at 648. See also Compania Ron Carioca Destileria, Inc. v. United States, 144 Ct.Cl. 66, 168 F.Supp. 546, 548 (1958) (“[A] payment ... of taxes expected to accrue in the future could not have been a payment of taxes ‘erroneously or illegally assessed or collected,’ for the collection of which plaintiff could have filed a claim for a refund.”)
In light of our holding in part III, below, that the money NYLife remitted to the Service was a deposit and not a payment of taxes, the deposit was made to cover “a payment ... of taxes expected to accrue in the future,” upon assessment, and was not “a payment of taxes ‘erroneously or illegally assessed, or collected.’ ” As the government recognized in its brief, since “the administrative claim required by I.R.C. § 6511(a) is a claim for an ‘overpayment,’ and that recovery is limited by I.R.C. § 6511(b)(2) to amounts ‘paid’ within specified periods prior to the claim, a refund suit is necessarily predicated on the existence of a tax ‘payment.’” Accordingly, the requirement in section 7422(a) that no suit for “recovery of any internal revenue tax” “shall be maintained” until a refund claim has been filed, does not apply to the suit brought by NYLife since it was not a suit for the return of a tax payment.
That conclusion accords with the purpose underlying the requirement of filing a refund claim, which “is to advise the appropriate officials of the demands or claims intended to be asserted, so as to insure an orderly ad *1559 ministration of the revenue---- It is the rejection [of the claim] which makes the suit necessary.” See Alexander Proudfoot Co. v. United States, 197 Ct.Cl. 219, 454 F.2d 1379, 1383 (1972) (quoting United States v. Felt & Tarrant Mfg. Co., 283 U.S. 269, 272-73, 51 S.Ct. 376, 377-78, 75 L.Ed. 1025 (1931)). The refund claim requirement “is designed both to prevent surprise and to give adequate notice to the Service of the nature of the claim ... thereby permitting an administrative investigation and determination.” See Proudfoot, 454 F.2d at 1383 (quoting Union Pacific R.R., Co. v. United States, 182 Ct.Cl. 103, 389 F.2d 437, 442 (1968)). Here there was no need to give the Service the opportunity to reexamine the merits issue, since NYLife had the right to a return of its deposit whenever it wished.
III.
On the merits, Cohen controls this case. There, on substantially identical facts, this court held that a similar remittal of funds was a deposit and not a payment.
In Cohen, following receipt of a ninety-day letter in which the Service proposed to disallow a deduction that the Cohens had taken on their federal income tax and impose a deficiency, and after the Cohens had filed a petition in the United States Tax Court contesting the deficiency, the Cohens sent the Service a check “in partial payment of the proposed deficiency,” which divided the payment between the “tax deficiency and interest thereon.”' Cohen, 995 F.2d at 206 n. 6. After the statute of limitations had run, the Service assessed a deficiency.
The Cohens filed with the Service a claim for refund of the amount remitted. After the Service failed to act on the claim for six months, the Cohens filed suit in the United States Claims Court for the money. That court granted summary judgment for the Cohens and this court affirmed.
Noting that the Cohens consistently had protested the proposed deficiency and that “the assessment was not made within the clear boundaries of time imposed by law or openly agreed to by the parties,” the court held that “the consequences are that the transfer of funds was a deposit as a matter of law, whether for purposes of refund, imposition of interest, or otherwise.” Id. at 209. The first sentence of the “Conclusion” of the opinion was as follows:
The remittance made by the Cohens, under protest, after a notice of deficiency but in clear circumstances of contest prior to expiration of the period for assessment, was a deposit as a matter of law.

Id.

The significant operational facts in the present case relating to whether NYLife’s remittance was a deposit or a payment are indistinguishable from those in Cohen. Here, as in Cohen, (1) the taxpayer received a letter from the Service proposing to assess a deficiency, (2) the taxpayer remitted money to the Service which it described as a “payment” of additional tax and which allocated the money between tax deficiency and interest thereon, (3) the taxpayer had protested the proposed deficiency and, in making the remittance, had reserved the right to seek recovery of the additional tax and (4) the Service failed timely to assess the additional tax deficiency. This case comes squarely within the ruling of Cohen that “[t]he remittance [it] made ... under protest, after a notice of deficiency but in clear circumstances of contest prior to expiration of the period of assessment, was a deposit as a matter of law.” Id.
The government points to the statement in Cohen that in Charles Leich & Co. v. United States, 165 Ct.Cl. 127, 329 F.2d 649 (1964) the Court of Claims, in determining that a taxpayer’s remittance was a deposit and not a payment, “examined the particular facts and circumstances of the case in reaching this conclusion.” Cohen, 995 F.2d at 208. It then argues that the “particular facts and circumstances” in the present case distinguish it from Cohen. That argument ignores the holding in Cohen that the taxpayer’s remittance, made under protest following a notice of deficiency and that reserved the right to seek return of the money, and the Service’s failure timely to assess the deficiency, made the remittance a deposit “as a matter of law.” Indeed, this is a stronger case than Cohen for treating the transmittal *1560 as a deposit, since there the Service made an untimely assessment, whereas here it made no assessment at all.
Finally, the government suggests that if Cohen requires the conclusion that NYLife’s remittance was a deposit, this court should revisit Cohen and modify or overrule it. It recognizes that to do so would require in banc action. The government did not seek rehearing in banc in Cohen, and it gives no reason why such step would be more appropriate now that it would have been then. There is no showing that the question is of sufficient importance to warrant in bane reconsideration of this recent decision, and the panel sees no occasion to recommend to the full court that it take that action.
The government states that the Court of Federal Claims’ decision is vulnerable because it permitted NYLife to recover its remittance without consideration of the merits of the negative rate issue (which underlay the increased liability). It contends that this result is contrary to “a basic principle of tax law — i.e., that a taxpayer cannot recover taxes collected within the period of assessment unless the taxpayer establishes that the United States was not entitled to the money.” That argument, however, could be made in every case in which recovery of a deposit of taxes is sought and the time for assessment has expired, since the essence of a deposit is that the taxpayer is entitled to recover it without regard to the merits of the underlying tax claim. The government can avoid this situation by making a timely assessment of the tax deficiency, which would assure it the right to litigate the merits of the deficiency-
CONCLUSION
The judgment of the Court of Federal Claims granting summary judgment for the plaintiff is

AFFIRMED.