**MASSACHUSETTS MUTUAL LIFE INSURANCE COMPANY,**
**Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 97–619T.**

United States Court of Federal Claims.

June 30, 2005.

Arthur L. Bailey, Steptoe & Johnson, L.L.P., Washington, DC, for plaintiff.

Mary Abate, United States Department of Justice, Washington DC, for defendant.

## MEMORANDUM OPINION AND ORDER

BRADEN, Judge.

Although the United States Court of Appeals for the Federal Circuit has decided five federal income tax cases applying the "all events test," established by the United States Supreme Court in *United States v. Anderson*, 269 U.S. 422, 431, 46 S.Ct. 131, 70 L.Ed. 347 (1926), none has addressed whether the right to receive supplemental premium income is "fixed" and when that amount of income can be determined with "reasonable accuracy" for purposes of calculating life insurance company taxable income— -the core issues presented in this case.

## PRELIMINARY FACTUAL BACKGROUND [1]

Plaintiff Massachusetts Mutual Life Insurance Co. ("MassMutual") is a mutual life insurance company organized under the laws of the Commonwealth of Massachusetts. *See* Joint Stip. ¶ 1. During the years 1984 through 1989, MassMutual was a life insurance company, as defined in 26 U.S.C. § 816(a).[2] *Id.* ¶ 2. MassMutual was a calen-

---

1. The facts recited herein were primarily derived from: the September 12, 1997 Complaint ("Compl."); the June 28, 2004 Joint Stipulation of Facts ("Joint Stip."); the July 7, 2004 Joint Stipulation of Exhibits ("Joint Ex."); MassMutual's July 15, 2004 Motion for Partial Summary Judgment ("Pl. Mot. Partial S.J.") and appendix thereto, including the Factual Affidavits of Stephen R. Bosworth ("Bosworth Aff."), Richard D. Bourgeois ("Bourgeois Aff."), John F. McBride ("McBride Aff."), and Deborah Riopelle ("Riopelle Aff."); the Government's September 21, 2004 Cross–Motion for Partial Summary Judgment and Opposition to Plaintiff's Motion for Summary Judgment ("Def. Mot. Partial S.J."); and the Government's October 4, 2004 Motions to Strike Portions of the Factual Affidavits of Stephen R. Bosworth ("Def. Mot. to Strike Bosworth"), Richard D. Bourgeois ("Def. Mot. to Strike Bourgeois") and John F. McBride ("Def. Mot. to Strike McBride"); the Government's October 5, 2004 Motion to Strike Portions of the Factual Affidavit of Deborah Riopelle ("Def. Mot. to Strike Riopelle").

2. The Internal Revenue Code of 1954, 26 U.S.C. § 101, *et seq.* applied to the tax years 1981–1986, and utilizes a similar definition of "life insurance company," as current 26 U.S.C. § 801(a). In 1986, the Internal Revenue Code of 1954 was amended by the Tax Reform Act of 1986, Pub.L. No. 99–514, 100 Stat.2085. The Internal Revenue Code of 1986, as amended, applies to the tax year 1987 and subsequent years.

26 U.S.C. § 816(a) (1986) provides that:
the term "life insurance company" means an insurance company which is engaged in the business of issuing life insurance and annuity contracts (either separately or combined with accident and health insurance), or noncancellable contracts of life and health insurance, if
(1) its life insurance reserves . . . , plus
(2) unearned premiums, and unpaid losses (whether or not ascertained), on noncancellable life, accident, or health policies not included in life insurance reserves,
comprise more than 50 percent of its total reserves (as defined in subsection (c)). For purposes of the preceding sentence, the term "insurance company" means any company more than half of the business of which during the taxable year is the issuing of insurance or annuity contracts or the reinsuring of risks underwritten by insurance companies.

dar year taxpayer, with the taxable year ending on December 31 of each year, during the years at issue. *Id.* ¶ 3. MassMutual did not change its overall method of accounting during these years. *Id.* ¶ 4.

As part of its insurance business, MassMutual underwrote group accident and health insurance policies ("Group Policies") to employers ("Plan Sponsors") that provided health insurance benefits for their employees. *Id.* ¶¶ 5, 6. An essential term of the Group Policies is that Plan Sponsors paid monthly premiums ("Group Policy Premiums") as a prerequisite for coverage by MassMutual. *See* Joint Ex. 1 at 11–13. Plan Sponsors funded Group Policies without riders by paying directly to MassMutual monthly premiums that were actuarially calculated to be sufficient to fund all costs of paying reimbursable claims incurred under the policy, including run-off claims[3] and extended benefits.[4]

In 1984, MassMutual began offering a Minimum Premium Plan ("MPP") Rider to holders of Group Policies as an option to the traditional benefits funding method. *See* Joint Stip. ¶ 11.

The MPP Rider amended the Group Policy by providing that:

This Rider changes the liability of the Insurer and the Plan Sponsor for the funding of benefits under the Group Policy. In return for a reduced premium, the Plan Sponsor will assume a share of the funding for the listed benefits. The extent of the Plan Sponsor's liability is determined below. In all other respects, the Group Policy terms will remain in full force and effect, unless a different result is stated in this Rider.

Joint Stip. ¶ 12.

The MPP Rider provided for:

**3.** Run-off claims are "claims that were incurred during the period of coverage (*i.e.*, before plan termination), but that were not filed, processed or approved for payment until after termination." McBride Aff. ¶ 15.

**4.** Extended benefits were described by MassMutual as follows:

[w]ith respect to employees who were disabled and who had been receiving benefits from

a. a reduced monthly premium [the "Minimum Premium"];

b. the Plan Sponsor to establish a bank account [the "Benefit Funding Account"]; and

c. a Supplemental Premium, payable after termination.

*Id.* ¶ 13.

The MPP Rider contained the following provisions concerning the funding and payment of plan benefits:

2. The Plan Sponsor is liable each Policy Month for funding of all Plan Benefits up to the sum of:

a. the Monthly Payment Limit for that month, and

b. the sum of the Plan Benefits paid on behalf of the plan sponsor in such Policy Months.

3. In any Policy Month the Insurer will pay on behalf of the Plan Sponsor all Plan Benefits which the Plan Sponsor has agreed to fund. The Insurer will fund and pay all Plan Benefits in excess of those that the Plan Sponsor has agreed to fund.

Joint Ex. 3 at 181.

Under the MPP Rider, the Plan Sponsor placed funds into the Benefit Funding Account sufficient to pay all Expected Claims it had agreed to fund, up to the limits specified in the Rider, the Monthly Payment Limit. *See* Joint Ex. 3 at 181; *see also* McBride Aff. ¶ 38. MassMutual withdrew funds from the Benefit Funding Account to fund Expected Claims. *See* McBride Aff. ¶ 39. It also would determine whether to fund the claim using the Benefit Funding Account, or whether the claim was an Excess Claim[5] that MassMutual was required to "fund and pay." *Id.; see also* McBride Aff. ¶ 41.

MassMutual when a non-MPP Rider arrangement terminated, MassMutual remained liable to pay claims that related to the disabling condition for up to 12 months after termination.

*Id.* ¶ 16.

**5.** Excess claims are "the amount by which actual claims exceed the 'expected claims.' " Joint Stip ¶ 17.

Minimum Premiums required under the MPP Rider were billed and payable monthly. *See* McBride Aff. ¶ 44.

The amount of the Minimum Premium payable by a Plan Sponsor was determined by multiplying a Minimum Premium rate by the number of covered employees.[6] *Id.* ¶ 46. The premium rates depended upon several factors, including who was covered, the scope of coverage, and what exclusions and limitations were specified. *Id.* On annual statements, MassMutual reported each monthly Minimum Premium as income when it was billed. *Id.* ¶ 51.

A MPP Rider could be terminated for various reasons. *Id.* ¶ 61. The MPP Rider contained the following terms concerning policy termination:

11. This Rider will terminate on the earliest of these dates:

● the date the Plan or the Group Policy terminates; or

● on any date that the Plan Sponsor fails to provides sufficient funds in the Benefit Funding Account to pay Plan Benefits as they arise.

This Rider may be terminated by:

● the Plan Sponsor on any Premium Due Date by advance written notice to the Insurer; or

● the Insurer at any time if it gives at least 31 days advance written notice to the Plan Sponsor.

12. When this Rider terminates the sum of (a) and (b) below will be due and payable without delay by the Plan Sponsor to the Insurer:

a. all unpaid monthly premiums; and

b. the Supplemental Premium.

13. When this Rider terminates, the Plan Sponsor will be liable for the funding of all plan benefits for which checks were issued on the Benefit Funding Account before this Rider terminated. But, the Plan Sponsor will not be liable for the funding of any other

Plan Benefits under this Rider after its termination.

Joint Ex. 3 at 182.

The MPP Rider provided for the payment of a Supplemental Premium upon the termination of a MPP Rider: "[i]n addition to the premium determined in accordance with the terms of the Group Policy, a Supplemental Premium will be due on each monthly Premium Due date. But this Supplemental Premium will not be payable until the date this Rider terminates." *Id.* The MPP Rider defined a Supplemental Premium as:

1. the Plan Sponsor's reserve liability as calculated by the Insurer at the beginning of the current policy month, plus

2. any excess of:

a. the sum of the Monthly Payment Limits for each preceding policy month of the Current Policy Year, over

b. all Plan Benefits the Insurer has paid on the Plan Sponsor's behalf in such Policy Year, plus

c. an appropriate adjustment for premium taxes on the amounts due under items 1. and 2. above.

*Id.* at 181.

MassMutual calculated the Plan Sponsor's reserve liability at the beginning of each month by multiplying the number of covered employees by a per employee rate.[7] The sum of the Monthly Payment Limits for the Policy Year over all Plan Benefits paid by the Insurer during that Policy Year was referred to as the "Plan Sponsor's unused claims liability." *See* McBride Aff. ¶ 71; *see also* Def. Cross Mot. for Partial S.J. at 26.

Supplemental Premium rates depended on such factors as who was covered by the Group Policy, the types of coverage provided, and what exclusions were specified. The Supplemental Premium also included charges for terminal administration costs (*i.e.*, the cost of paying run-off claims and extended benefits). *See* McBride Aff. ¶ 69.

---

6. For example, if the Minimum Premium rate per employee was $50, and the employer had 100 employees, the monthly Minimum Premium was $5000.

7. For example, if a Supplemental Premium rate was $200 per employee, and there were 300 employees, the Plan Sponsor's reserve liability would be $6000.

## PROCEDURAL HISTORY

### A. Administrative Proceedings At The Internal Revenue Service.

#### 1. MassMutual Filed Federal Income Tax Returns For The Tax Years Ending 1981, 1984, 1985, 1986, And 1987.

MassMutual filed federal income tax returns for the tax years 1981, 1984, 1985, and 1986. *See* Compl. ¶¶ 7, 9. The returns for those years listed the following amounts due:

| Year | Tax Due |
|------|---------|
| 1981 | $ 21,125,741 |
| 1984 | $ 66,600,765 |
| 1985 | $ 80,795,998 |
| 1986 | $176,018,508 |

*Id.* ¶ 7. MassMutual made timely payments to the IRS in the full amount of income taxes due for each of these tax years. *Id.* ¶ 8.

On November 2, 1988, MassMutual timely filed a Form 1139 with the Internal Revenue Service ("IRS"), pursuant to which MassMutual carried back an operations loss and certain credits incurred for the 1987 tax year to the years 1984 and 1985. *Id.* ¶ 11. Accordingly, on December 26, 1988, MassMutual received a refund of federal income tax paid for the tax year 1984 in the amount of $66,001,718 and a refund of $98,806 in federal income tax paid for the 1985 tax year. *Id.*

In addition, on December 26, 1988, MassMutual filed a federal income tax return for the 1987 tax year showing an operations loss in the amount of $191,035,337, but taxes due from recomputing a prior year investment tax credit in the amount of $75,783. *Id.* ¶ 9. Accordingly, MassMutual made a timely payment to the IRS for $75,783 due for the 1987 tax year. *See* Compl. ¶ 10.

#### 2. MassMutual's Deficiencies And Assessments.

The IRS audited MassMutual's federal income tax returns for the tax years 1981 and 1984 through 1987 and proposed to adjust the taxable income amount for those years and assert and assess deficiencies. *Id.* ¶ 12. On July 26, 1991, MassMutual executed a Form 870 (Waiver of Restrictions on Assessment and Collection of Deficiency in Tax and Acceptance of Overassessment) with respect to the 1985 tax year and agreed to pay additional taxes in the amount of $6,098,251 and interest in the amount of $4,544,367. *Id.* ¶ 13. MassMutual paid these amounts on July 24, 1991. *Id.*

For the tax years 1981 and 1984 through 1987, MassMutual filed protest letters with the IRS, contesting the proposed adjustments regarding tax liabilities for those years. *Id.* ¶ 14. Thereafter, MassMutual executed Forms 870-AD agreeing to federal income tax deficiencies and overassessments for the tax years 1981 and 1984 through 1986. *Id.* ¶ 15. On December 20, 1989, MassMutual executed a Form 870-AD for the 1981 tax year and agreed to an assessment of federal income tax in the amount of $10,836,967. *Id.* ¶ 16. On January 26, 1990, MassMutual paid the $10,836,937 assessed tax deficiency to the IRS, together with assessed interest in the amount of $16,455,517. *See* Compl. ¶ 18. On September 1, 1991, MassMutual executed a Form 870-AD for the 1984 tax year and agreed to an assessment of federal income tax in the amount of $3,448,141. *Id.* ¶ 19. On October 29, 1991, MassMutual paid the $3,448,141, together with assessed interest in the amount of $5,726,817.81. *Id.* ¶ 21.

On July 26, 1995, MassMutual executed a Form 870-AD for the 1985 tax year and agreed to an assessment of federal income tax in the amount of $85,570. *Id.* ¶ 22. On November 24, 1995, the IRS assessed related deficiency interest in the amount of $444,089.41 for the 1985 tax year. *Id.* ¶ 24. On December 11, 1995, however, the IRS abated the $85,570 tax overassessment. *Id.* On December 12, 1995, the IRS paid $573,757.11 to MassMutual, comprised of $444,089.41 for federal income taxes and paid $129,667.70 of interest, for the 1985 tax year. *See* Compl. ¶ 25. On May 8, 1996, MassMutual paid $594,816.87 of assessed interest to the IRS for the tax year 1985. *Id.* ¶ 25.

On July 26, 1995, MassMutual executed a Form 870-AD for the 1986 tax year and agreed to an assessment of $9,182,275 in federal income taxes. *Id.* ¶ 26. On December 22, 1995, MassMutual paid $9,182,275 to the IRS, together with $11,245,666.11 in as-

sessed interest. *Id.* ¶ 28. On March 27, 1996, MassMutual paid an additional $146.13 in federal income tax for the 1986 tax year. *Id.* ¶ 29.

During discussions with MassMutual in 1995, the IRS proposed certain adjustments that reduced the amount of MassMutual's operations losses for the tax year 1987. *Id.* ¶ 30. These adjustments reduced the operations loss carryback from 1987 to 1984. *See* Compl. ¶ 30. Accordingly, on July 26, 1995, MassMutual executed a Form 870–AD for the 1984 tax year. *Id.* MassMutual accepted an assessment of federal income tax deficiency in the amount of $10,976,226 and on March 12, 1996, paid the $10,976,226 assessed together with $9,976,061.63 in assessed interest. *Id.* ¶ 32.

### 3. MassMutual's Claims For Federal Income Tax Refunds.

### a. MassMutual's Prior Refund Claim For The 1984 Tax Year.

On October 27, 1993, MassMutual timely filed a refund claim with the IRS for the 1984 tax year. *Id.* ¶ 36. The claim sought a $1,144,676 refund of federal income tax based on issues reserved in the Form 870–AD. *Id.*[8] By a September 22, 1995 letter, revised on October 3, 1995, the IRS allowed in part and disallowed in part this refund claim. *Id.* ¶ 37. The IRS incorporated the partial allowance into the computation of the $10,976,226 deficiency previously assessed against MassMutual. *Id.*

### b. MassMutual's Refund Claims For The 1981 And 1984 Through 1986 Tax Years.

On May 21, 1996, MassMutual timely filed federal income tax refund claims for the tax years 1981, 1984, 1985, and 1986, with the IRS. *See* Compl. ¶ 38. The refund filed for the 1981 tax year claimed $8,464,597 was due, of which $1,228,375 was attributable to an excess general business credit from the 1984 tax year to the 1981 tax year, as permitted by the Form 870–AD executed for the tax year 1981. *Id.* ¶ 39. The excess general

business credit carryback was attributable to an increased operations loss carryback from the 1987 tax year to the 1984 tax year. *Id.*

The refund filed for the 1984 tax year claimed $14,788,732 due based on the restatement of a prior refund filed on October 27, 1993, as well as the increased amount of operations loss carryback from the 1987 tax year to the 1984 tax year attributable to the issues reserved on the Forms 870–AD executed for 1987 and 1984. *Id.* ¶ 40.

The refund filed for the 1985 tax year claimed $5,112,175 was due based on issues reserved on the Form 870–AD executed for 1985. *Id.* ¶ 41. In addition, on February 12, 1997, MassMutual filed a claim using Form 843 in the amount of $444,089.41 for assessed interest that MassMutual paid on May 8, 1996 for the 1986 tax year.

The refund filed for the 1986 tax year claimed $15,246,329 was due based on the issues reserved on the Form 870–AD executed for that year. *Id.* ¶ 42.

### B. Proceedings In The United States Court Of Federal Claims.

On September 12, 1997, MassMutual filed a Complaint in the United States Court of Federal Claims seeking a refund of $36,375,611 for federal income taxes paid and assessed interest for the tax years 1981, 1984, 1985, and 1986, plus interest and costs. *See* Compl. Prayer for Relief ¶¶ 1–2. This case was assigned to the Honorable John P. Wiese.

The Complaint sets forth eight bases for refund claims:

1. 26 U.S.C. § 481 Adjustments (*See* Compl. ¶¶ 46–53);

2. 58 C.S.O. Permanent Life Insurance Reserves (*Id.* ¶¶ 54–73);

3. Interest on Dividend Accumulations (*Id.* ¶¶ 74–83);

4. Section 809 Equity Base Adjustments (*Id.* ¶¶ 84–102);

5. Interest on Deferred Compensation (*Id.* ¶ 103–110).

---

8. MassMutual expressly reserved the right to file or prosecute refund claims for the tax years 1981 and 1984 through 1987. *See* Compl. ¶¶ 17, 20, 23, 27, and 31.

6. Separate Account Dividends Received Deduction (*Id.* ¶¶ 111–16);

7. Minimum Premium Plans and Supplemental Premiums (*See* Compl. ¶¶ 132–40).

8. Recomputed Differential Earnings Amount (*Id.* ¶¶ 141–50);

On June 29, 1998, the Government filed an Answer. Fact and expert discovery commenced on October 29, 1998. On February 26, 2002, the parties reached collateral agreements regarding all claims except those related to the Minimum Premium Plans and Supplemental Premiums. *Id.* ¶¶ 132–40.

\*    \*    \*    \*    \*    \*

On August 15, 2003, this case was reassigned to the undersigned judge. On October 1, 2003, the court convened a telephone status conference, during which discovery was extended to December 1, 2003 and the court was informed of the parties' efforts to settle remaining issues. On December 5, 2003, the court entered an order granting the Government's unopposed motion for an extension of time to complete discovery by February 1, 2004.

On February 18, 2004, the court convened another telephone status conference, at which time the parties' settlement efforts were discussed. Following an April 2, 2004 Joint Status Report, the court entered a Scheduling Order on April 7, 2004 establishing a briefing schedule for summary judgment motions on the disputed Minimum Premium Plans and Supplemental Premium claims. On June 7, 2004, the court amended the briefing schedule and extended the date by which MassMututal was required to file a Motion for Partial Summary Judgment. On June 28, 2004, the parties filed a Joint Stipulation of Facts. On July 7, 2004, the parties filed a Joint Stipulation of Exhibits.

On July 15, 2004 MassMutual filed a Motion for Partial Summary Judgment and Brief in Support. On September 17, 2004 the Government filed Proposed Findings of Uncontroverted Fact. On September 21, 2004, the Government filed a Cross–Motion for Partial Summary Judgment and Opposition to MassMutual's Motion for Partial Summary Judgment. On September 21, 2004,

the Government also filed a Declaration of Mary M. Abate, Counsel for the Government in these proceedings, corrected on October 1, 2004. On September 22, 2004 the Government filed a Statement of Genuine Issues.

On October 4, 2004, the Government filed motions to strike portions of the Factual Affidavits of: John F. McBride; Steven R. Bosworth; Richard D. Bourgeios; and Deborah Riopelle. On October 22, 2004, MassMutual filed responses to: the Government's Cross–Motion for Partial Summary Judgment and the Government's Proposed Findings of Uncontroverted Fact. On October 29, 2004, MassMutual filed Oppositions to: the Government's Motion to Strike Portions of the Factual Affidavits of Richard D. Bourgeois, John F. McBride, and Stephen R. Bosworth.

On November 24, 2004, the Government replied to MassMutual's October 22, 2004 Responses. On November 29, 2004, the Government filed a Reply in support of the September 21, 2004 Cross–Motion for Partial Summary Judgment. On December 20, 2004, MassMutual filed a surreply in response to the Government's November 29, 2004 Reply and the Government's November 24, 2004 Replies to MassMutual's responses to the Government's motions to strike.

On January 27, 2005, the Government filed "Comments Regarding Plaintiff's Accusation of Unethical Conduct." MassMutual submitted a response on January 28, 2005.

MassMutual's July 15, 2004 Motion for Partial Summary Judgment; the Government's September 21, 2004 Cross–Motion for Partial Summary Judgment and Opposition to MassMutual's Motion for Partial Summary Judgment; and the Government's October 4, 2004 Motions to Strike Portions of the Factual Affidavits of Stephen R. Bosworth, Richard D. Bourgeois, John F. McBride, and Deborah Riopelle are pending for resolution.

## DISCUSSION

**A. Jurisdiction.**

The United States Court of Federal Claims has "jurisdiction to render judgment upon any claim against the United States

founded upon ... any act of Congress or any regulation of an executive department[.]" 28 U.S.C. § 1491; *see also New York Life Ins. Co. v. United States,* 118 F.3d 1553, 1558 (Fed.Cir.1997) (reaffirming the jurisdiction of the United States Court of Claims over a suit concerning a federal tax refund). The Complaint properly alleges jurisdiction under 28 U.S.C. § 1491. *See* Compl. ¶ 1.

Although the United States Court of Federal Claims has jurisdiction over federal income tax refund suits, a jurisdictional prerequisite is that the taxpayer make full payment of the tax liability, penalties, and interest at issue. *See Flora v. United States,* 362 U.S. 145, 163, 80 S.Ct. 630, 4 L.Ed.2d 623 (1960) (holding that a taxpayer must pay the full amount of income tax deficiency assessed before challenging its correctness in a refund forum); *see also New York Life,* 118 F.3d at 1559 (stating that the purpose of the "full payment" rule is "to prevent surprise and to give adequate notice to the Service of the nature of the claim ... thereby permitting an administrative investigation and determination."). In addition, the taxpayer is required to file a claim for refund with the IRS for the amount of tax in controversy. *See* 26 U.S.C. § 7422(a); *see also* RCFC 9(h)(6) (requiring a taxpayer to provide the amount, date, and place of each payment to be refunded, as well as a copy of the refund claim, when filing a refund suit in the United States Court of Federal Claims).

The Complaint also satisfies all other jurisdictional requirements. On May 21, 1996, MassMutual filed a claim for a refund for the 1981, 1984, 1985, and 1986 tax years. *See* Compl. ¶ 38. In addition, MassMutual paid the tax amounts in dispute, as required by 26 U.S.C. § 6511(a), on the following dates: January 26, 1990, in the amount of $10,836,967, together with assessed interest of $16,455,517; October 29, 1991, in the amount of $3,448,141, together with assessed interest of $5,726,817.81; May 8, 1996, assessed interest in the amount of $594,816.87; December 22, 1995, in the amount of $9,182,275, together with $11,245,666.11 in assessed interest; March 12, 1996, in the amount of $10,976,226, together with $9,976,061.63 in assessed interest; and March 27, 1996, in the amount of $146.13.[9] *Id.* ¶¶ 18–32.

On December 12, 1996, the IRS notified MassMutual of the disallowance of the refund claims. On September 12, 1997, MassMutual filed a Complaint in the United States Court of Federal Claims, well within the six year statute of limitations, set forth in 28 U.S.C. § 2501.

## B. Summary Judgment.

If there is no genuine issue as to any material fact, the moving party is entitled to summary judgment as a matter of law. *See Winstar Corp. v. United States,* 64 F.3d 1531, 1539 (Fed.Cir.1995) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)); *see also* RCFC 56(c). A material fact is one that might significantly affect the outcome of the suit under applicable law. *See Anderson,* 477 U.S. at 247–48, 106 S.Ct. 2505 ("As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted.... That is, while the materiality determination rests on the substantive law, it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs."). The existence of "*some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment[.]" *Id.* Where the non-moving party only proffers evidence that is "merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249–50, 106 S.Ct. 2505 (citations omitted).

The party moving for summary judgment has the initial burden of demonstrating the absence of any genuine issue of material fact.

---

**9.** MassMutual had a net operating loss for the 1987 tax year and did not have any federal income taxes due for that year.

*See Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party carries its burden to demonstrate an absence of any genuine issue of material fact, then the burden of proof shifts to the non-moving party to show a genuine factual dispute exists. *See Sweats Fashions, Inc. v. Pannill Knitting Co., Inc.,* 833 F.2d 1560, 1563 (Fed.Cir.1987). An issue is genuine only if it might prompt a reasonable fact-finder to resolve a factual matter in favor of the non-moving party. *Id.* at 1562–63.

The court is required to resolve any doubts about factual issues in favor of the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). In addition, all presumptions and inferences must be resolved in favor of the non-moving party. *See Jay v. Secretary of Dept. of Health and Human Servs.,* 998 F.2d 979 (Fed.Cir.1993).

The fact that both parties have moved for summary judgment does not relieve the court of its responsibility to determine the appropriateness of summary disposition. *See Prineville Sawmill Co. v. United States,* 859 F.2d 905, 911 (Fed.Cir.1988). Summary judgment, however, will not necessarily be granted to one party or another when both parties have filed motions. *Id.* (citing *Mingus Constructors, Inc. v. United States,* 812 F.2d 1387, 1390 (Fed.Cir.1987)). The court must evaluate each party's motion on its own merits. *Id.*

## C. Relevant Statutory Provisions And Internal Revenue Service Pronouncements.

### 1. Life Insurance Companies And Life Insurance Taxable Income Under 26 U.S.C. §§ 801, *et seq.*

Congress has determined that a company is an "insurance company" for purposes of the Internal Revenue Code if two prerequisites are met. First, if more than half of the business conducted during the taxable year entails the issuance of insurance or annuity contracts or reinsuring risks underwritten by insurance companies. *See* 26 U.S.C. § 816(a);[10] *see also* ANDERSON ¶ 1.03. Second, a "life insurance company" sells life insurance and annuity contracts or noncancellable contracts of health and accident insurance, if the company's life insurance reserves, together with unearned premiums, unpaid losses, or noncancellable life, accident, or health policies comprise more than 50% of the company's total reserves. *See* 26 U.S.C. § 816(a). MassMutual is a life insurance company for purposes of the Internal Revenue Code. *See* Joint Stip. ¶ 2.

A life insurance company's federal taxes are determined by the amount of "life insurance taxable income" attributable to it for the taxable year and computed by subtracting "life insurance deductions" from "life insurance gross income." *See* 26 U.S.C. § 801(b);[11] *see also* 26 U.S.C. § 803(a) (defining "life insurance gross income" as the sum of premiums received, certain reserve decreases, and all other amounts "which under this subtitle are includible in gross income.").[12] Gross premium income includes:

---

10. 26 U.S.C. § 816(a) provides that:

> For purposes of this subtitle, the term "life insurance company" means an insurance company which is engaged in the business of issuing life insurance and annuity contracts (either separately or combined with accident and health insurance), or noncancellable contracts of health and accident insurance, if—
> (1) its life insurance reserves (as defined in subsection (b)), plus
> (2) unearned premiums, and unpaid losses (whether or not ascertained), or noncancellable life, accident, or health policies not included in life insurance reserves,
> comprise more than 50 percent of its total reserves (as defined in subsection (c)). For purposes of the preceding sentence, the term

"insurance company" means any company more than half of the business of which during the taxable year is the issuing of insurance or annuity contracts or the reinsurance of risks underwritten by insurance companies.

11. 26 U.S.C. § 801(b) provides:

> For purposes of this part, the term "life insurance taxable income" means
> (1) life insurance gross income, reduced by
> (2) life insurance deductions.

12. 26 U.S.C. § 803(a) provides:

> In general. For purposes of this part, the term "life insurance gross income" means the sum of the following amounts:

advance premiums; deposits; fees; assessments; consideration in respect of assuming liabilities under contracts not issued by the taxpayer; and policyholder dividends reimbursable to the taxpayer by a reinsurer for reinsured policies. *See* 26 U.S.C. § 803(b)(1).[13]

### 2. The Accrual Method Of Accounting Must Be Used By Life Insurance Companies Under 26 U.S.C. § 811(a).

Congress requires that life insurance companies must compute annual taxable income using the accrual method of accounting or a combination of the accrual method and any another authorized accounting method. *See* 26 U.S.C. § 811(a).[14] In addition, all tax computations of life insurance company taxes must be "made in a manner consistent with

---

(1) Premiums-
(A) The gross amount of premiums and other consideration on insurance and annuity contracts, less
(B) return premiums, and premiums and other consideration arising out of indemnity reinsurance.
(2) Decreases in certain reserves. Each net decrease in reserves that is required by Section 807(a) to be taken into account under this paragraph.
(3) Other amounts. All amounts not includible under paragraph (1) or (2) which under this subtitle are includible in gross income.

**13.** 26 U.S.C. § 803(b)(1) provides:
(1) Special rules for premiums.-
(1) Certain items included.-For purposes of subsection (a)(1)(A), the term "gross amount of premiums and other consideration" includes-
(A) advance premiums,
(B) deposits,
(C) fees,
(D) assessments,
(E) consideration in respect of assuming liabilities under contracts not issued by the taxpayer, and
(F) the amount of policyholder dividends reimbursable to the taxpayer by a reinsurer in respect of reinsured policies, on insurance and annuity contracts.

**14.** 26 U.S.C. § 811(a) provides that
All computations entering into the determination of the taxes imposed by this part shall be made -
(1) under an accrual method of accounting, or
(2) to the extent permitted under regulations prescribed by the Secretary, under a combination of an accrual method of accounting with any other method permitted by this chapter

---

the manner required for purposes of the annual statement approved by the National Association of Insurance Commissioners." *Id.*

Treasury Regulation 1.818–2(a)(1) provides that "the over-all method of accounting for life insurance companies shall be the accrual method," and that "the term 'accrual method' shall have the same meaning and application in section 818 as it does under section 446[.]" 26 C.F.R. § 1.818–2(a)(1).[15]

Generally, federal taxable income is computed under the method of accounting used in keeping the taxpayer's books. *See* 26 U.S.C. § 446(a).[16] A method of accounting used by a federal taxpayer must clearly reflect the taxpayer's income. *See* 26 U.S.C. § 446(b).[17] Authorized methods of account-

---

(other than the cash receipts and disbursements method).
To the extent not inconsistent with the preceding sentence or any other provision of this part, all such computations shall be made in a manner consistent with the manner required for purposes of the annual statement approved by the National Association of Insurance Commissioners.

**15.** 26 C.F.R. § 1.818–2(a)(1) provides:

Section 818(a)(1) provides the general rule that all computations entering into the determination of taxes imposed by part I, subchapter L, chapter 1 of the Code, shall be made under an accrual method of accounting. Thus, the over-all method of accounting for life insurance companies shall be the accrual method. Except as otherwise provided in part I, the term "accrual method" shall have the same meaning and application in section 818 as it does under section 446 (relating to general rule for methods of accounting) and the regulations thereunder. For general rules relating to the taxable year for inclusion of income and deduction of expenses under an accrual method of accounting, see sections 451 and 461 and the regulations thereunder.

**16.** 26 U.S.C. § 446(a) provides that "taxable income shall be computed under the method of accounting on the basis of which the taxpayer regularly computes his income in keeping his books."

**17.** 26 U.S.C. § 446(b) provides:

If no method of accounting has been regularly used by the taxpayer, or if the method used does not clearly reflect income, the computation of taxable income shall be made under

ing include: the cash receipts and disbursements method; the accrual method; and any other method permitted by statute, or permissible combinations thereof. *See* 26 U.S.C. § 446(c).[18]

## D. The "All Events Test" Determines The Year In Which An Item Of Income Accrues For Tax Accounting Purposes Under 26 C.F.R. § 1.446–1(c)(ii)(A).

In *United States v. Anderson,* 269 U.S. 422, 431, 46 S.Ct. 131, 70 L.Ed. 347 (1926), the United States Supreme Court held that: "[I]n advance of the assessment of a tax, all the events may occur which fix the amount of the tax and determine the liability of the taxpayer to pay it." This became known as the "all events test" and eventually was incorporated into a Treasury Regulation. *See* 26 C.F.R. § 1.446–1(c)(ii)(A). In later cases, the United States Supreme Court has referred to the "all events test" as the " 'touchstone' for determining the year in which an item of [income or] deduction accrues and as a fundamental principle of tax accounting." *United States v. Hughes Properties, Inc.,* 476 U.S. 593, 600, 106 S.Ct. 2092, 90 L.Ed.2d 569 (1986) (quoting *United States v. Consolidated Edison Co. of N.Y.,* 366 U.S. 380, 385, 81 S.Ct. 1326, 6 L.Ed.2d 356 (1961)); *see also United States v. General Dynamics Corp.,* 481 U.S. 239, 242, 107 S.Ct. 1732, 95 L.Ed.2d 226 (1987) ("whether a business expense has been incurred so as to entitle an accrual-basis taxpayer to deduct it . . . [or whether a right to payment has been fixed requiring the taxpayer to treat it as accrued income] is governed by the 'all events' test[.]"). Under the accrual method of accounting, income accrues when both parts of the "all events test" are established; that is, "income is to be included for the taxable year when [1] all the events have occurred that fix the right to receive the income and [2] the amount of the income can be determined with reasonable accuracy." 26 C.F.R. § 1.446–1(c)(ii)(A); *see also* 26 C.F.R. § 1.451–1(a).[19]

### 1. When The Right To Receive Income Becomes Fixed.

The first part of the "all events test" for income accrual requires that the right to receive income be "fixed." In *Brown v. Helvering,* 291 U.S. 193, 199, 54 S.Ct. 356, 78 L.Ed. 725 (1934), the United States Supreme Court clarified that where a taxpayer uses the accrual method of accounting, "income is to be accounted for the year in which it is realized, even if not then actually received[.]" *See also Schlude v. Comm'r,* 372 U.S. 128, 134, 83 S.Ct. 601, 9 L.Ed.2d 633 (1963) (quoting *Spring City Foundry Co. v. Comm'r,* 292 U.S. 182, 184–85, 54 S.Ct. 644, 78 L.Ed. 1200 (1934)) ("For an accrual basis taxpayer it is the right to receive and not the actual receipt that determines the inclusion of the amount in gross income. When the right to receive an amount becomes fixed, the right accrues."). Even if income is received, however, it does not "accrue" if the taxpayer's right to retain the income is "contingent upon events outside its control." *Comm'r v. Indianapolis Power & Light Co.,* 493 U.S. 203, 214, 110 S.Ct. 589, 107 L.Ed.2d 591 (1990).

The fact that a taxpayer may not be able to "presently compel [payment], and therefore . . . have not acquired a presently enforceable right to recover [payment]" is im-

---

such method as, in the opinion of the secretary, does clearly reflect income.

**18.** 26 U.S.C. § 446(c) provides:

Subject to the provisions of subsections (a) and (b), a taxpayer may compute taxable income under any of the following methods of accounting:
(1) the cash receipts and disbursements method;
(2) an accrual method;
(3) any other method permitted by this chapter; or
(4) any combination of the foregoing methods permitted under regulations prescribed by the Secretary.

**19.** 26 C.F.R. § 1.451–1(a) provides:

Gains, profits, and income are to be included in gross income for the taxable year in which they are actually or constructively received by the taxpayer unless includible for a different year in accordance with the taxpayer's method of accounting. Under an accrual method of accounting, income is includible in gross income when all the events have occurred which fix the right to receive such income and the amount thereof can be determined with reasonable accuracy.

material as to whether the taxpayer's right to receive income is fixed: "[T]he question is not whether the taxpayers can presently recover [payment], for, as stated, it is the time of acquisition of the fixed right to receive the payment and not the time of their actual receipt that determines whether or not the [payments] have accrued and are taxable." *Comm'r v. Hansen,* 360 U.S. 446, 463, 79 S.Ct. 1270, 3 L.Ed.2d 1360 (1959) (emphasis omitted). An accrual basis taxpayer must report income in the year the right to such income accrues, "despite the necessity for mathematical computations or ministerial acts." *Resale Mobile Homes, Inc. v. Comm'r,* 965 F.2d 818, 823 (10th Cir.1992).

The IRS has advised federal taxpayers that "[a]ll the events that fix the right to receive income referred to in [26 C.F.R. § 1.451–1(a) ] occur when either (1) the required performance takes place, or (2) payment is due, or (3) payment is made." Rev. Rul. 84–31, 1984–1 C.B. 127; *see also* Rev. Rul. 79–195, 1979–1 C.B. 177; *European Am. Bank & Trust Co. v. U.S.,* 20 Cl.Ct. 594, 604–05 (1990), *aff'd per curiam,* 940 F.2d 677 (Fed.Cir.1991) ("A fixed right to receive income occurs when (a) the required performance take place, (b) payment is due, or (c) payment is made.").

A right to receive income, however, is not considered fixed "where a taxpayer's right to receive income is subject to a substantial contingency." MERTENS LAW OF FEDERAL INCOME TAXATION ("MERTENS") § 12.15 (March 2005). Where income is subject to a substantial contingency, the right to receive income will not become fixed "until the contingency is extinguished. The existence of a contingency is not sufficient to prevent accrual; it must be of sufficient magnitude to prevent establishing the time of the right to receive income." *Id.; see also Charles Baloian Co., Inc. v. Comm'r,* 68 T.C. 620, 628, 1977 WL 3658 (1977); *see also* Rev. Rul. 78–388, 1978–2 C.B. 110.

### 2. When The Amount Of Income Can Be Determined With "Reasonable Accuracy."

In *Continental Tie & Lumber Co. v. United States,* 286 U.S. 290, 52 S.Ct. 529, 76 L.Ed. 1111 (1932), the United States Supreme Court held that the "reasonable accuracy" requirement differs from the "fixed" requirement of the "all events test:"

> This case does not fall within the principle that, where the liability is undetermined in the tax year, the taxpayer is not called upon to accrue any sum, but presents the problem whether the taxpayer had in its own books and accounts data to which it could apply the calculations required by the statute and ascertain the quantum of the award within reasonable limits.

*Id.* at 296, 52 S.Ct. 529.

The amount of an item of income also "must be firmly established" and not "mere[ly] forecast" in order to be determined with reasonable accuracy. *See General Dynamics,* 481 U.S. at 239, 107 S.Ct. 1732. The United States Court of Appeals for the Tenth Circuit held that where the taxpayer sold retail sales contracts for mobile homes to a finance company for the principal amount stated remaining under the contracts and a right to receive a portion of the interest charged to the purchaser, the "participation interest," the duty of the finance company to make payments to the taxpayer was deferred, until the finance company received principal and interest payments from the purchasers, thereby making the precise amount of interest uncertain until the date of the purchasers' payment (*i.e.,* interest might not be paid in the event of prepayment or default). *See Resale Mobile Homes,* 965 F.2d at 823. That federal appellate court further held that "[a]lthough the exact amounts that petitioner would eventually receive varied based upon the time of payment, prepayments and defaults," the amounts of participation interests could be determined with reasonable accuracy: "that the participation interest is to be paid petitioner when interest is paid to the finance company in reality is an issue of timing and does not make the payment of participation interest less certain or genuinely conditional." *Id.* at 823–24.

### E. Summary Judgment Is Not Appropriate Because Issues Of Material Fact Exist.

A determination of when MassMutual's right to receive Supplemental Premiums was

fixed primarily depends on whether: 1) Supplemental Premiums were due prior to MPP Rider termination; 2) Supplemental Premiums were earned through performance prior to MPP Rider termination; and 3) MassMutual's right to receive Supplemental Premiums was subject to any substantial contingencies.

The briefs and proposed findings submitted by the parties highlight that numerous material facts are and remain in dispute,[20] including the following:

### 1. Whether Supplemental Premiums Were Due Prior To MPP Rider Termination?

The parties assert different interpretations of the term "due" under the MPP Rider regarding the Supplemental Premium. MassMutual claims that the Supplemental Premium became due "upon actual termination of the MPP Rider arrangement[.]" McBride Aff. ¶ 68. MassMutual also contends that "the Letter of Agreement, internal communications, and marketing materials ... expressly stated that Supplemental Premiums were not due prior to MPP Rider termination." Pl. Mot. Partial S.J. at 19. The Government maintains that the Supplemental Premium "was 'due' on each monthly Premium Due Date [because it was paid in consideration for coverage provided that month.] Termination of the Rider was not the event that caused the Supplemental Premium to become 'due.'" Def. Mot. Strike McBride ¶ 68.

### 2. Whether Supplemental Premiums Were Earned Through Performance Prior To MPP Rider Termination?

MassMutual argues that Supplemental Premiums compensated MassMutual for assuming liability for run-off claims and extended benefits after MPP Rider termination, and for performing administrative duties related to those claims and benefits. *See* Pl. Mot. Partial S.J. at 22. Because run-off claims, extended benefits, and related administration did not exist until after a MPP Rider terminated, it was impossible for MassMutual to perform prior to MPP Rider termination. *Id.* The Government argues that the two components of the Supplemental Premium related to coverage already provided by MassMutual at the beginning of each month. *See* Gov't Mot. Partial S.J. at 26–27.

### 3. Whether MassMutual's Right To Receive Supplemental Premiums Was Subject To Any Substantial Contingencies?

MassMutual contends that after termination, the Plan Sponsor remained liable to fund only Expected Claims for which checks were drawn on the Benefit Funding Account before the Rider terminated. After termination, the Plan Sponsor was no longer liable to fund any other claims incurred before Plan Termination. *See* McBride Aff. ¶ 62. The Government argues that "[u]nder a Group Policy, MassMutual retained the liability for paying the run-off claims and extended benefits. The Rider 'unbundled' the 'regular' premium payable monthly under the Group Policy *without* Rider." Def. Mot. to Strike McBride ¶¶ 59, 60 (citations omitted).

### CONCLUSION

For the reasons stated herein and set forth in RCFC 59(c), the parties' cross-motions for partial summary judgment are hereby denied. The court will convene a status conference with the parties to establish a schedule for trial.

**IT IS SO ORDERED.**

---

20. In addition, the Government has moved to strike portions of the factual affidavits on which many of MassMutual's factual assertions are based because certain portions of affidavits are inadmissible hearsay, inconsistent with admissions made by MassMutual in discovery responses or with factual stipulations, parol evidence, or are opinion rather than fact. *See* Mot. to Strike McBride; Mot. to Strike Bosworth; Mot. to Strike Bourgeois; Mot. to Strike Riopelle. The Government also challenges the competency of the affiants to testify concerning the tax treatment of the Supplemental Premiums at issue. Under the circumstances, the interests of justice are best served by affording MassMutual the opportunity to proffer these witnesses at trial and for the Government to make and preserve objections at that time.