**Colleen MURPHY, Plaintiff,**

v.

**UNITED STATES, Defendant.**

No. 05–567C.

United States Court of Federal Claims.

Feb. 22, 2006.

---

Barbara A. Norris, Anchorage, Alaska, for the plaintiff.

Douglas K. Mickle, Trial Attorney; James M. Kinsella, Deputy Director; David M. Cohen, Director, Commercial Litigation Branch, Civil Division; Peter D. Keisler, Assistant Attorney General, United States Department of Justice, Washington, DC, for the defendant. Beverly Dart, Department of Health and Human Services, of counsel.

## OPINION

HORN, Judge.

Plaintiff, Colleen Murphy, M.D., a former officer in the United States Public Health Service Commissioned Corps, brought this action seeking relief under the Military Pay Act, 37 U.S.C. § 204 (2000). Plaintiff claims that she requested early separation from the Public Health Service Commissioned Corps, allegedly under duress and as a result of the coercive actions of her fellow officers. She argues that her separation was, in fact, a constructive discharge. Plaintiff seeks retroactive reinstatement, lost pay and allowances, active duty credit towards her retirement, refund of her Variable Incentive Pay, medical expenses that would have been paid but for the loss of allowances and benefits, correction of her employment records, other consequential damages and equitable relief, as well as costs and attorney fees.

Defendant filed a motion to dismiss, arguing that plaintiff voluntarily separated from her position in the Public Health Service Commissioned Corps and, therefore, that this court lacks jurisdiction to review the plaintiff's claim. After a thorough review of the record and submissions filed by the parties, the court concludes that the plaintiff has failed to rebut the presumption that her separation was voluntary. Consequently, the United States Court of Federal Claims does not have jurisdiction to entertain plaintiff's

claim. Defendant's motion to dismiss for lack of subject matter jurisdiction is granted.

## FINDINGS OF FACT

The plaintiff, Colleen Murphy, M.D., entered the Commissioned Corps of the United States Public Health Service in June, 1982.[1] Prior to entering office, plaintiff signed an oath stating: "I am willing to serve in any area or position or wherever the exigencies of the Service may require."

During her nearly seventeen-year career, plaintiff states that she received numerous awards, including the Foreign Duty Award and the Isolated Hardship Award. In August, 1987, plaintiff began working at the Alaska Native Medical Center (ANMC) in Anchorage, Alaska, as part of the Indian Health Service (IHS). While serving at the ANMC, plaintiff states that she earned four Unit Commendations, an Achievement and Outstanding Service Medal, and the Anchorage Community Woman of Achievement Award. Plaintiff indicates that she was selected as Chief of the Obstetrics and Gynecology (Ob/Gyn) Department at the ANMC in 1993, and was promoted to the temporary grade of Captain (Medical Director) in the Public Health Service Commissioned Corps in 1997. As Chief of the Ob/Gyn Department, plaintiff's duties included supervision of other physicians in the department, including Dr. Neil Murphy (no relation).

The complaint alleges that: "On October 4, 1994, Dr. Neil Murphy negligently caused a patient death during a diagnostic hysteroscopy and laparoscopy . . . ." The complaint further alleges that the resulting civil case eventually was settled for $700,000.00. Plaintiff states that as the Department Chief she requested Dr. Neil Murphy to voluntarily relinquish his clinical privileges in hysteroscopy and undergo certain retraining, which he did. She informed the Hospital Medical Director, Dr. David Barrett, and the Risk Manager, Zoe Quirk, of the disciplinary action. Also

according to the plaintiff, state and federal law required further reporting of the incident by the ANMC Hospital Director, Rear Admiral (Dr.) Richard Mandsager, to the appropriate authorities. She believes Dr. Mandsager chose not to do so in order to protect Dr. Neil Murphy's reputation. According to the complaint, two years later, Dr. Neil Murphy applied for clinical privileges at the Anchorage Veteran's Administration Hospital, but did not, as required, acknowledge on his application the previous loss of his clinical privileges. In her complaint, plaintiff states that she believed such an omission constituted submission of false information and misconduct under Public Health Service Commissioned Corps "regulations." She reported the alleged omission to the Medical Director, Dr. David Westley.

Plaintiff further alleges that after she reported the incident involving Dr. Neil Murphy, he and other officer physicians became insubordinate and antagonistic to her supervision. In the face of what plaintiff describes as increasing hostility from the other physicians, both superiors and subordinates, plaintiff resigned her position as Chief of the Ob/Gyn Department at the ANMC in April, 1996, but remained in the department as a physician. Dr. Mandsager chose Dr. Neil Murphy as her replacement. Plaintiff alleges that once Dr. Neil Murphy became her supervisor, he "began a course of retaliatory conduct towards plaintiff," including seventeen critical memoranda over a twelve-month period, threatening to delay her promotion to permanent Captain's (O–6) status, obstructing her efforts to develop a computerized medical record for obstetrical care, excluding plaintiff from meetings, and other allegedly hostile and retaliatory acts. Plaintiff argues that even though these allegedly retaliatory acts were prohibited by the Public Health Service's standards of conduct, plaintiff's grievances to Hospital Director Mandsager were denied.[2]

---

1. Pursuant to 5 U.S.C. § 2101(3) (2000), the Public Health Service Commissioned Corps is part the of "uniformed services," including the armed forces, and the commissioned corps of the National Oceanic and Atmospheric Administration.

2. Throughout the complaint, and in the documents filed on plaintiff's behalf, a number of incidents of retaliatory behavior are alleged. The court has carefully reviewed the entire record, but has listed only a few exemplary allegations in this opinion.

According to the complaint, in 1998, ANMC's primary care services, including the Ob/Gyn services, were transferred to new management, the South Central Foundation. Plaintiff understood that all Public Health Service Commissioned Corps officers were to be transferred to work under the direction of the South Central Foundation. According to plaintiff's complaint, on February 6, 1998, however, Hospital Director Mandsager, and Dr. Neil Murphy, then Chief of the Ob/Gyn Department, held a meeting with Medical Director Westley, Dr. Nighswander, Dr. Strange, South Central Medical Director Eby, IHS Labor Relations Specialist Hunt, and Hospital Administrator Carole. In her complaint, plaintiff alleges that:

> The purpose of the meeting was a conspiracy of federal commissioned corps officers to falsely defame plaintiff, and to recommend that South Central Foundation single her out and refuse to accept her transfer with the rest of her department, so she would be forced out of her position. Officers Mandsager, Neil Murphy and others knew that or believed that the above-board removal of plaintiff from her position on the Ob/Gyn Department in Anchorage under Commissioned Corps procedures would be an adverse action and could not be substantiated under facts of procedure. Because they could not get rid of her legally, these officers conspired to wrongfully eject Dr. Colleen Murphy under the subterfuge that the action was not one of the Commissioned Corps officers, but the action of the tribe. This was a meeting of commissioned officers and federal administrators, intending to cause a negative personnel action against a fellow officer, without any just cause and outside the Commissioned Corps policies and procedures, with the plan to make it look like the tribe did it, as a cover-up.

> The officers at the meeting sat around making jokes about sending plaintiff as far away as possible. They actually took a vote to get rid of her and they all voted to do so except LaVonne Carole who abstained because she objected to the procedure and what they were doing.

> The following Monday Dr. Strange informed the plaintiff that she would not receive a Memorandum of Agreement with South Central.

Soon thereafter, plaintiff states she was assigned to Information Technology, a position with no clinical duties, from which plaintiff alleges she could not maintain her clinical credentials.

In July, 1998, plaintiff entered into a new Memorandum of Agreement with another tribal entity, Alaska Native Tribal Health Consortium (ANTHC), which operated at the ANMC. Plaintiff alleges that even though she continued to have medical privileges at the ANMC, Dr. Neil Murphy blocked her from performing services. Plaintiff contends that these actions were contrary to the Medical Staff Bylaws. On March 8, 1999, Paul Sherry, President/CEO of the ANTHC, notified Mr. Mandregan, Director of the Alaska Area Native Health Services, that the ANTHC was "terminating our Memorandum of Agreement for the assignment of Captain Colleen Murphy... in the position of Clinical Specialty Consultant effective this date." Plaintiff admits in her Opposition to Defendant's Motion to Dismiss that: "The tribes could terminate a Memorandum of Agreement at any time, without stating a cause." Plaintiff, however, alleges that "she was ousted from her position with ANTHC the same way she was ousted from work for South Central Foundation: the tribe was coerced by federal Officers not to work with her." Plaintiff further alleges that these actions were led by Dr. Neil Murphy in retaliation for her reporting his misconduct, and by Hospital Director Mandsager, who wanted the plaintiff transferred out of Alaska before his failure to report Dr. Neil Murphy's misconduct was discovered. In plaintiff's view, by coercing the tribes to cancel plaintiff's contract, Dr. Neil Murphy and Hospital Director Mandsager were able "to instigate Dr. Colleen Murphy's termination without taking responsibility for an adverse action."

As a member of the Public Health Service Commissioned Corps, particularly once her contract was terminated, plaintiff was subject to the IHS's Agency–Wide Redeployment Program contained in "Indian Health Service Circular No. 96–08." This Circular states:

"[d]ecisions will be based on the needs of the IHS and, whenever possible and practicable, the desires of individual employees." The Circular also requires a redeployment request to include a certification that: "all attempts to place the employee(s) within the Area or Headquarters have been fully exhausted ...." There is no indication in the record that at the time of her redeployment plaintiff was unaware of the provisions of Indian Health Service Circular No. 96–08, 42 C.F.R. § 21.33 (1999), which stated that she was appointed to the "general service and shall be subject to change of station," and the terms of her oath of office, which stated that she is "willing to serve in any area or position or wherever the exigencies of the Service may require."

On March 17, 1999, after IHS received notification from the ANTHC that it had terminated plaintiff's Memorandum of Agreement, Mr. Mandregan "determined that there are no suitable positions for Dr. Murphy in Anchorage or within Alaska currently under the control of the IHS." Thereafter, Mr. Mandregan certified that he had "exhausted all attempts to find a suitable assignment for Captain Murphy within the Alaska Area." In her filings with the court, plaintiff, however, alleges that IHS management made no effort to place her in Alaska in accordance with IHS internal guidance and that Dr. Mandsager even admonished her for attempting to contact local tribes on her own. On April 2, 1999, plaintiff was told she would be transferred and should report to a Public Health Service hospital in Phoenix, Arizona within five days.

Plaintiff requested to use her 52.5 days of accumulated leave to allow her children to remain in Anchorage through the end of the school year and to give herself time to develop a Memorandum of Agreement with another tribe in Alaska. On April 8, 1999, IHS sent plaintiff a memorandum which granted her five days of annual leave, and informed her that "planning is currently underway to assign you on temporary duty to the Santa Fe PHS Indian Hospital for an initial term of approximately ninety days beginning April 19, 1999." On April 13, 1999, the Santa Fe facility declined to accept plaintiff on tempo-rary duty assignment. The following day, while waiting to receive a redeployment recommendation from the IHS Redeployment Review Committee and the IHS Director of Field Operations, Mr. Mandregan granted plaintiff an additional ten days of annual leave until April 30, 1999. Plaintiff alleges that the cancelled reassignments to Phoenix and Santa Fe demonstrate that IHS had no need for her services outside of Alaska. In support of this claim, plaintiff alleges that she contacted the Santa Fe hospital and learned that it had not advertised a need for anyone of her qualifications, the physician she was supposed to replace was leaving due to a lack of work, and the Santa Fe Director had been told to take her with no questions asked.

On April 19, 1999, Don Davis, Director of IHS Field Operations, sent plaintiff a letter notifying her that she was to be redeployed to the position of Medical Officer in the Ob/Gyn Department in Gallup, New Mexico. In the letter, Mr. Davis explained:

> In accordance with the Agency Wide Redeployment Program, a review board was convened for the purpose of the [sic] considering IHS wide needs for a physician with your credentials. The review board determined that the Navajo Area IHS [in Gallup, New Mexico] had the greatest need for your services, and made the recommendation that you be transferred to the Navajo Area. I am in agreement with the recommendation of the review board ....

Mr. Davis granted plaintiff's request to use her remaining available annual leave and delayed the redeployment until June 14, 1999, noting, "I am of the understanding that this will permit your children to finish the school year in their current school system, and will give you the time necessary to arrange for your transfer."

Plaintiff, however, believes that there was no need for her services in Gallup, that the reassignment was retaliatory and was designed to remove her from the service. Plaintiff grieved the redeployment and made a number of other allegations to the Director of Field Operations, Don Davis. In a letter dated May 13, 1999, Mr. Davis denied plain-

tiff's grievances and explained that the reassignment was being taken as a result of: 1) the termination of your Memorandum of Assignment with the Alaska Native Health Tribal Consortium at the request of the Alaska Native Tribal Health Consortium; 2) the fact that there are no fundable vacancies within the Alaska Area Indian Health Service which are suitable to your credentials; 3) IHS Circular 96–08, "Agency–Wide Redeployment Program" procedures; 4) IHS wide needs for an officer with your credentials; and 5) your oath of office as a commissioned officer. On May 18, 1999, plaintiff appealed Mr. Davis' decision. On May 25, 1999, Mr. Davis forwarded plaintiff's appeal to Deputy Director Lincoln of the IHS.

On May 26, 1999, the Chugachmiut, an Alaska tribal organization, contacted Mr. Mandregan and made a written request for plaintiff's services in the position of Medical Director. Under such an agreement, plaintiff believed that she would have been able to serve out her remaining three years to retirement in Alaska. Mr. Mandregan denied the request in a letter to the Chugachmiut dated June 9, 1999, citing the following three concerns: 1) the need to balance the needs of the IHS programs in Alaska with the needs of the broader IHS health service delivery system which faced shortages of Ob/Gyns at four hospitals; 2) because the Chugachmiut agreement stated only 30 percent of plaintiff's time would be spent in service of Chugachmiut health programs, plaintiff would spend the majority of her time serving non-beneficiaries in a private sector facility; and 3) the Federal Tort Claims Act would not cover plaintiff's work outside the 30 percent of work done for the Chugachmiut.

Deputy Director Lincoln's decision denying plaintiff's appeal was signed June 16, 1999. Mr. Lincoln wrote:

I want to reemphasize Mr. Davis' statement to you that your assignment to Gallup Indian Medical Center is not an act of reprisal but is consistent with the utilization of the commissioned corps within IHS and the Department. I am sympathetic to your personal desires in this situation. Regretfully, there is no option to accommodate them. I have made my decision about your grievance with both your personal needs and IHS' obligation in mind. IHS has a positive obligation to assign commissioned officers to productive duties consistent with their training and experience. Currently, there are no assignments appropriate for you in Alaska.

Plaintiff appealed Mr. Lincoln's decision on June 23, 1999. However, on June 11, 1999, plaintiff signed a memorandum to Mr. Ron. [sic] Davis stating that as a result of "an excruciatingly painful career decision" she would be submitting her separation papers via express mail on June 14, 1999.[3] Additionally, her letter explained, "I will gladly retract my separation papers if arrangements could be made to work with the Alaskan Tribe Chugachmiut."

On June 14, 1999, plaintiff signed her separation papers from the Public Health Service Commissioned Corps, citing as the reason, "constructive discharge due to retaliatory deployment out of Alaska, wrongful conduct by IHS and Alaska Native Tribal Health Consortium employers." Because Public Health Service Commissioned Corps regulations required thirty days notice on separation requests, plaintiff reported to Gallup, New Mexico as required on June 16, 1999. Plaintiff alleges that the Gallup hospital had "little for her to do" and, consequently, she filled in as a Physician's Assistant for two weeks, and performed two additional weeks of minor ambulatory and inpatient care.

On June 24, while serving in Gallup prior to her scheduled separation on July 14, 1999, plaintiff submitted a request for early retirement, characterizing her separation as a constructive discharge based on a retaliatory transfer, following a series of unfair personnel actions from 1996 to 1999. The IHS denied her request for early retirement based on a twenty-year, statutory, service commitment requirement prior to retirement and encouraged the plaintiff to seek reassignment consistent with her needs and the

---

**3.** IHS did not process plaintiff's third level appeal of Deputy Director Lincoln's decision because her early separation rendered the appeal moot.

needs of the Service. Rather than seek reassignment elsewhere in the Corps, plaintiff completed her thirty days in Gallup prior to her scheduled separation. On July 14, 1999, pursuant to her request, plaintiff was separated from the Public Health Service Commissioned Corps.

Plaintiff filed a complaint in this court on May 23, 2005, alleging that she had been constructively and involuntarily discharged from the Commission Corps. Defendant filed a motion to dismiss for lack of jurisdiction, arguing plaintiff's separation was voluntary and that this court is without jurisdiction to hear cases from uniformed services members who voluntarily separate.

## DISCUSSION

### I. Jurisdiction

Subject matter jurisdiction may be challenged at any time by the parties, by the court *sua sponte*, and even on appeal. *See Fanning, Phillips, Molnar v. West*, 160 F.3d 717, 720 (Fed.Cir.1998) (quoting *Booth v. United States*, 990 F.2d 617, 620 (Fed.Cir.), *reh'g denied* (1993)); *United States v. Newport News Shipbuilding and Dry Dock Co.*, 933 F.2d 996, 998 n. 1 (Fed.Cir.1991). "In fact, a court has a duty to inquire into its jurisdiction to hear and decide a case." *Special Devices, Inc. v. OEA, Inc.*, 269 F.3d 1340, 1342 (Fed.Cir.2001) (citing *Johannsen v. Pay Less Drug Stores N.W. Inc.*, 918 F.2d 160, 161 (Fed.Cir.1990)); *see also View Eng'g, Inc. v. Robotic Vision Sys., Inc.*, 115 F.3d 962, 963 (Fed.Cir.1997) ("[C]ourts must always look to their jurisdiction, whether the parties raise the issue or not."). A plaintiff must establish jurisdiction by a preponderance of the evidence. *See Reynolds v. Army and Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed.Cir.1988); *Thomas v. United States*, 56 Fed.Cl. 112, 115 (2003); *Martinez v. United States*, 48 Fed.Cl. 851, 857 (2001), *aff'd in part*, 281 F.3d 1376 (Fed.Cir.), *reh'g denied* (2002); *Bowen v. United States*, 49 Fed.Cl. 673, 675 (2001), *aff'd*, 292 F.3d 1383 (Fed.Cir. 2002); *Vanalco, Inc. v. United States*, 48 Fed.Cl. 68, 73 (2000); *Alaska v. United States*, 32 Fed.Cl. 689, 695 (1995), *appeal dismissed*, 86 F.3d 1178 (Fed.Cir.1996) (table). When construing the pleadings pursuant to a motion to dismiss, the court should grant the motion only if "it appears beyond doubt that [the plaintiff] can prove no set of facts in support of [the] claim which would entitle [the plaintiff] to relief." *Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 654, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999) (quoting *Conley v. Gibson*, 355 U.S. 41, 46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)); *Brubaker Amusement Co. v. United States*, 304 F.3d 1349, 1355 (Fed.Cir.2002), *cert. denied sub nom. Penn Triple S v. United States*, 538 U.S. 921, 123 S.Ct. 1570, 155 L.Ed.2d 311 (2003); *Leider v. United States*, 301 F.3d 1290, 1295 (Fed.Cir.), *reh'g and reh'g en banc denied* (2002), *cert. denied*, 538 U.S. 978, 123 S.Ct. 1786, 155 L.Ed.2d 666 (2003); *Conti v. United States*, 291 F.3d 1334, 1338 (Fed.Cir.), *reh'g en banc denied* (2002), *cert. denied*, 537 U.S. 1112, 123 S.Ct. 904, 154 L.Ed.2d 785 (2003); *Consol. Edison Co. v. O'Leary*, 117 F.3d 538, 542 (Fed.Cir.1997), *cert. denied sub nom. Consol. Edison Co. v. Pena*, 522 U.S. 1108, 118 S.Ct. 1036, 140 L.Ed.2d 103 (1998); *see also New Valley Corp. v. United States*, 119 F.3d 1576, 1579 (Fed.Cir.), *reh'g denied, and reh'g en banc declined* (1997); *Highland Falls–Fort Montgomery Cent. School Dist. v. United States*, 48 F.3d 1166, 1169 (Fed.Cir.), *cert. denied*, 516 U.S. 820, 116 S.Ct. 80, 133 L.Ed.2d 38 (1995); *Hamlet v. United States*, 873 F.2d 1414, 1416 (Fed.Cir.1989); *W.R. Cooper Gen. Contractor, Inc. v. United States*, 843 F.2d 1362, 1364 (Fed.Cir.1988) ("When the facts alleged in the complaint reveal 'any possible basis on which the nonmovant might prevail, the motion must be denied.'"); *RCS Enters., Inc. v. United States*, 46 Fed.Cl. 509, 513 (2000).

Pursuant to RCFC 8(a)(1) and Rule 8(a)(1) of the Federal Rules of Civil Procedure, a plaintiff need only state in the complaint "a short and plain statement of the grounds upon which the court's jurisdiction depends." RCFC 8(a)(1). However, "[d]etermination of jurisdiction starts with the complaint, which must be well-pleaded in that it must state the necessary elements of the plaintiff's claim, independent of any defense that may be interposed." *Holley v. United States*, 124 F.3d 1462, 1465 (Fed.Cir.), *reh'g denied* (1997) (citing *Franchise Tax Bd. v. Constr. Laborers*

*Vacation Trust,* 463 U.S. 1, 103 S.Ct. 2841, 77 L.Ed.2d 420 (1983)). Nevertheless, "conclusory allegations unsupported by any factual assertions will not withstand a motion to dismiss." *Briscoe v. LaHue,* 663 F.2d 713, 723 (7th Cir.1981), *aff'd,* 460 U.S. 325, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983); *Bradley v. Chiron Corp.,* 136 F.3d 1317, 1322 (Fed.Cir. 1998) ("Conclusory allegations of law and unwarranted inferences of fact do not suffice to support a claim.").

When deciding a motion to dismiss based on a lack of subject matter jurisdiction, this court must assume that all undisputed facts alleged in the complaint are true and must draw all reasonable inferences in the non-movant's favor. *See Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Conley v. Gibson,* 355 U.S. at 45–46, 78 S.Ct. 99; *Boise Cascade Corp. v. United States,* 296 F.3d 1339, 1343 (Fed.Cir.2002), *cert. denied,* 538 U.S. 906, 123 S.Ct. 1484, 155 L.Ed.2d 226 (2003); *Pixton v. B & B Plastics, Inc.,* 291 F.3d 1324, 1326 (Fed.Cir.2002); *Commonwealth Edison Co. v. United States,* 271 F.3d 1327, 1338 (Fed.Cir.2001) (quoting *New Valley Corp. v. United States,* 119 F.3d at 1580), *cert. denied,* 535 U.S. 1096, 122 S.Ct. 2293, 152 L.Ed.2d 1051 (2002); *Boyle v. United States,* 200 F.3d 1369, 1372 (Fed.Cir. 2000); *Perez v. United States,* 156 F.3d 1366, 1370 (Fed.Cir.1998); *Highland Falls–Fort Montgomery Cent. School Dist. v. United States,* 48 F.3d at 1167 (citing *Gould, Inc. v. United States,* 935 F.2d 1271, 1274 (Fed.Cir. 1991)); *Henke v. United States,* 60 F.3d 795, 797 (Fed.Cir.1995); *Hamlet v. United States,* 873 F.2d at 1416; *Ho v. United States,* 49 Fed.Cl. 96, 100 (2001), *aff'd,* 30 Fed.Appx. 964 (Fed.Cir.2002); *Alaska v. United States,* 32 Fed.Cl. at 695. If a defendant or the court challenges jurisdiction or plaintiff's claim for relief, however, the plaintiff cannot rely merely on allegations in the complaint, but must instead bring forth relevant, competent proof to establish jurisdiction. *McNutt v. Gen. Motors Acceptance Corp. of Ind.,* 298 U.S. 178, 189, 56 S.Ct. 780, 80 L.Ed. 1135 (1936); *see also Land v. Dollar,* 330 U.S. 731, 735 n. 4, 67 S.Ct. 1009, 91 L.Ed. 1209 (1947); *Reynolds v. Army and Air Force Exch. Serv.,* 846 F.2d at 747; *Catellus Dev. Corp. v. United States,* 31 Fed.Cl. 399, 404–05 (1994).

In order for this court to have jurisdiction over a plaintiff's complaint, the Tucker Act requires that the plaintiff identify an independent substantive right enforceable against the United States for money damages. *See* 28 U.S.C. § 1491 (2000). The Tucker Act states:

The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

28 U.S.C. § 1491(a)(1). As interpreted by the United States Supreme Court, this Act waives sovereign immunity to allow jurisdiction over claims (1) founded on an express or implied contract with the United States, (2) seeking a refund from a prior payment made to the government or (3) based on federal constitutional, statutory, or regulatory law mandating compensation by the federal government for damages sustained. *See United States v. Testan,* 424 U.S. 392, 400, 96 S.Ct. 948, 47 L.Ed.2d 114, *reh'g denied,* 425 U.S. 957, 96 S.Ct. 1736, 48 L.Ed.2d 202 (1976) (citing *Eastport Steamship Corp. v. United States,* 178 Ct.Cl. 599, 605–06, 372 F.2d 1002, 1009 (1967)); *see also Palmer v. United States,* 168 F.3d at 1314; *Stinson, Lyons & Bustamante, P.A. v. United States,* 33 Fed. Cl. 474, 478 (1995), *aff'd,* 79 F.3d 136 (Fed. Cir.1996). A waiver of traditional sovereign immunity cannot be implied but must be "unequivocally expressed." *INS v. St. Cyr,* 533 U.S. 289, 299 n. 10, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001); *United States v. Nordic Village, Inc.,* 503 U.S. 30, 33, 112 S.Ct. 1011, 117 L.Ed.2d 181 (1992); *Ins. Co. of the West v. United States,* 243 F.3d 1367, 1372 (Fed. Cir.), *reh'g and reh'g en banc denied* (2001); *Saraco v. United States,* 61 F.3d 863, 864 (Fed.Cir.1995) (quoting *United States v. King,* 395 U.S. 1, 4, 89 S.Ct. 1501, 23 L.Ed.2d 52 (1969)), *cert. denied,* 517 U.S. 1166, 116 S.Ct. 1565, 134 L.Ed.2d 665 (1996).

The Tucker Act, however, merely confers jurisdiction on the United States Court of Federal Claims; " 'it does not create any substantive right enforceable against the United States for money·damages.' " *United States v. Mitchell,* 445 U.S. 535, 538, 100 S.Ct. 1349, 63 L.Ed.2d 607 (quoting *United States v. Testan,* 424 U.S. at 398–99, 96 S.Ct. 948), *reh'g denied,* 446 U.S. 992, 100 S.Ct. 2979, 64 L.Ed.2d 849 (1980); *White Mountain Apache Tribe v. United States,* 249 F.3d 1364, 1372 (Fed.Cir.2001), *aff'd,* 537 U.S. 465, 123 S.Ct. 1126, 155 L.Ed.2d 40 (2003); *Cyprus Amax Coal Co. v. United States,* 205 F.3d 1369, 1373 (Fed.Cir.2000), *cert. denied,* 532 U.S. 1065, 121 S.Ct. 2214, 150 L.Ed.2d 208 (2001); *New York Life Ins. Co. v. United States,* 118 F.3d 1553, 1555–56 (Fed.Cir. 1997), *cert. denied,* 523 U.S. 1094, 118 S.Ct. 1559, 140 L.Ed.2d 792 (1998); *United States v. Connolly,* 716 F.2d 882, 885 (Fed.Cir.1983) *(en banc), cert. denied,* 465 U.S. 1065, 104 S.Ct. 1414, 79 L.Ed.2d 740 (1984). Individual claimants, therefore, must look beyond the jurisdictional statute for a waiver of sovereign immunity. *United States v. Mitchell,* 445 U.S. at 538, 100 S.Ct. 1349. In order for a claim to be successful, the plaintiff "must also demonstrate that the source of law relied upon 'can fairly be interpreted as mandating compensation by the federal government for the damages sustained.' " *White Mountain Apache Tribe v. United States,* 249 F.3d at 1372 (quoting *United States v. Mitchell,* 463 U.S. 206, 216–17, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983)); *see also United States v. Testan,* 424 U.S. at 400, 96 S.Ct. 948; *Fisher v. United States,* 402 F.3d 1167, 1173–74 (Fed.Cir.2005) (en banc); *Tippett v. United States,* 185 F.3d 1250, 1254 (Fed.Cir. 1999) ("[T]he plaintiff must assert a claim under a separate money-mandating constitutional provision, statute, or regulation, the violation of which supports a claim for damages against the United States." (quoting *James v. Caldera,* 159 F.3d 573, 580 (Fed. Cir.1998), *reh'g denied* (1999))); *Doe v. United States,* 100 F.3d 1576, 1579 (Fed.Cir.1996), *reh'g and reh'g en banc denied* (1997); *Eastport Steamship Corp. v. United States,* 178 Ct.Cl. at 607, 372 F.2d at 1009.

## II. Voluntariness

In the present case, plaintiff has properly identified the act which covers the pay and allowances of the uniformed services, known as the Military Pay Act, 37 U.S.C. § 204 (2000), as a money-mandating statute. Section 204 provides that members of a uniformed service are entitled to basic pay and allowances. Accordingly, if plaintiff was improperly or involuntarily released from active duty, her statutory right to pay was not extinguished and she would be entitled to back pay and allowances. *See Tippett v. United States,* 185 F.3d at 1255; *Adkins v. United States,* 68 F.3d 1317, 1321 (Fed.Cir. 1995), *reh'g denied* (1996). In accordance with this court's RCFC 12(b)(1), confirmed by a long line of cases issued by the United States Court of Appeals for the Federal Circuit, if plaintiff's separation from the military was voluntary, no jurisdiction resides in this court. *See Carmichael v. United States,* 298 F.3d at 1371 ("If a discharge from service is voluntary, then the Court of Federal Claims lacks jurisdiction to review the discharge or any back pay damages claims."); *Moyer v. United States,* 190 F.3d 1314, 1318–19 (Fed. Cir.1999) (noting this rule is "based on the common sense notion that one who voluntarily gives up any right to compensation and benefits cannot later claim entitlement to such"); *Tippett v. United States,* 185 F.3d at 1255; *Adkins v. United States,* 68 F.3d at 1321; *Sammt v. United States,* 780 F.2d 31, 33 (Fed.Cir.1985). As the United States Court of Appeals for the Federal Circuit reasoned in *Tippett:*

> If Tippett's discharge was involuntary and improper, his statutory right to pay was not extinguished and thus serves as a basis for Tucker Act jurisdiction. *See Adkins,* 68 F.3d at 1321. If, however, Tippett's discharge was voluntary, his right to pay ended upon his discharge. He thus would have retained no statutory entitlement to compensation, and consequently no money-mandating provision would support Tucker Act jurisdiction over his claim.

*Tippett v. United States,* 185 F.3d at 1255. The Court of Federal Claims generally has followed this rule, refusing to hear claims for back pay pursuant to the Military Pay Act

when a plaintiff's resignation or retirement was voluntary. *See Sinclair v. United States,* 66 Fed.Cl. 487, 491 (2005); *Moody v. United States,* 58 Fed.Cl. 522, 524 (2003); *Gavin v. United States,* 47 Fed.Cl. 486, 489 (2000) (noting that a plaintiff who voluntarily resigns from active duty in the armed services divests the Court of Federal Claims of jurisdiction), *review dismissed,* 25 Fed.Appx. 882 (Fed.Cir.2001); *Soeken v. United States,* 47 Fed.Cl. 430, 434 (2000), *aff'd,* 20 Fed. Appx. 900 (Fed.Cir.2001).

Pronouncements in this area of the law, however, have been somewhat confusing. Compare, for example, the military disability case of *Fisher v. United States,* 402 F.3d 1167. In the *Fisher* decision, Senior Circuit Judge Plager noted that:

In Tucker Act jurisprudence, however, the neat division between jurisdiction and merits has not proved to be so neat. In these cases, involving suits against the United States for money damages, the question of the court's jurisdictional grant blends with the merits of the claim. This mixture has been a source of confusion for litigants and a struggle for courts.

*Fisher v. United States,* 402 F.3d at 1171–72. The money-mandating statute at issue in *Fisher* was 10 U.S.C. § 1201 (1994), which provided for military disability retirement pay. *Id.* at 1174 ("In this case, Dr. Fisher has little difficulty establishing that § 1201 is understood as money-mandating."). Judge Plager continued:

The resolution of the first issue, then, is that Dr. Fisher's well-pleaded complaint, clearly grounded on a statute that mandates compensation, gives the Court of Federal Claims subject-matter jurisdiction to address the case on the merits.

The resolution of the second issue—what are the consequences, once the court has taken jurisdiction, of plaintiff failing to establish all elements of the cause of action— follows from the answer to the first, though admittedly the answer has not always been stated in a consistent fashion. Assuming that the Court of Federal Claims has taken jurisdiction over the cause as a result of the initial determination that plaintiff's cause rests on a money-mandating source, the consequence of a ruling by the court on the merits, that plaintiff's case does not fit within the scope of the source, is simply this: plaintiff loses on the merits for failing to state a claim on which relief can be granted.

*Fisher v. United States,* 402 F.3d at 1175–76 (citing *Palmer v. United States,* 168 F.3d 1310, 1313 (Fed.Cir.1999)).

Dr. Fisher had completed his active duty service commitment, and had been released from active duty "in the normal course ...." *Fisher v. United States,* 402 F.3d at 1170. His complaint was that the various medical boards before which he appeared should have given him a medical discharge, so he could receive disability retirement pay from the date he completed his active duty service commitment. *Id.* at 1169–71. In contrast, David Carmichael had complained that the Navy erroneously listed his discharge as "voluntary," when his discharge was involuntary and based on the government's wrongful, coercive acts. *Carmichael v. United States,* 298 F.3d at 1371–72. Because *Fisher* does not involve this voluntariness issue, and *Carmichael* and plaintiff Dr. Colleen Murphy's case do, in the case currently under review, the court follows the jurisdictional analysis in the *Carmichael* line of cases.

The *Fisher* decision also cited the earlier *Palmer* case. *Fisher v. United States,* 402 F.3d at 1176. Colonel Palmer had complained of an involuntary and wrongful transfer by the Army Reserves into a non-pay billet. *Palmer v. United States,* 168 F.3d at 1312–14. The Federal Circuit in *Palmer* noted that the pay statutes for Reservists only pay for drills actually attended:

Reservists in a pay billet typically perform a period of active duty for training each year, usually of two weeks duration. Members in such pay billets are paid by the military only for drills actually attended, *see* 37 U.S.C. § 206(a)(1) (1994), and for active duty for training actually performed, *see* 37 U.S.C. § 204(a)(2) (1994).

The consequence of this difference in pay entitlement between full-time active duty personnel and those serving part-time reserve duty is that a member who is serving in part-time reserve duty in a pay

billet, or was wrongfully removed from one, has no lawful pay claim against the United States for unattended drills or for unperformed training duty.

*Palmer v. United States,* 168 F.3d at 1314 (citations omitted). Colonel Palmer, therefore, could not identify a money-mandating statute entitling him to a pay remedy fundamental to jurisdiction in this court. *Id.* The trial court decision in *Palmer,* which was affirmed by the Federal Circuit, however, treated the case as presented on cross-motions for summary judgment,[4] in which the government prevailed, not as a case presenting a jurisdictional defect. *Id.* at 1313.

A recent appeal to the Federal Circuit from the Merit Systems Protection Board (MSPB), which addressed the issue of jurisdiction based on the specialized statutes and regulations of the MSPB, also is of interest. *See Garcia v. Dep't of Homeland Sec.,* 437 F.3d 1322 (Fed.Cir.2006) (en banc). The Federal Circuit in *Garcia* considered two lines of MSPB cases that had developed. In one, exemplified by *Cruz v. Department of the Navy,* 934 F.2d 1240, 1251–53 (Fed.Cir. 1991) (en banc), Mr. Cruz failed to prove by a preponderance of the evidence that his resignation was involuntary, so the MSPB dismissed his case for want of jurisdiction. *Garcia v. Dep't of Homeland Sec.,* 437 F.3d at 1324, 1332 (citing cases following *Cruz*). Julio Cruz alleged he had been coerced into resigning from the Navy. *Id.* at 1330. The MSPB judge found that Mr. Cruz had presented non-frivolous allegations, but after a hearing concluded his resignation was voluntary, and dismissed the case for want of jurisdiction, not for failure to state a claim upon which relief can be granted. *Id.* On appeal, the Federal Circuit determined in *Cruz* that MSPB jurisdiction over a constructive removal or demotion action does not attach until an employee establishes by a preponderance of the evidence that a resignation was coerced or otherwise involuntary.

*Id.* at 1331 (citing *Cruz v. Dep't of the Navy,* 934 F.2d at 1244). "Ultimately, the Board 'never acquired jurisdiction' [in *Cruz* ] because the claimant failed to prove that his resignation was involuntary." *Id.* at 1331 (quoting *Cruz v. Dep't of the Navy,* 934 F.2d at 1248).

The other line of MSPB cases is exemplified by *Spruill v. Merit Systems Protection Board,* 978 F.2d 679 (Fed.Cir.1992), in which the Federal Circuit stated that the MSPB's jurisdiction over claims involving discrimination and protected whistleblowing activity is established by non-frivolous allegations. *See Garcia v. Dep't of Homeland Sec.,* at 1332–35 (citing other cases which relied on *Spruill's* non-frivolous allegation of jurisdiction standard in constructive adverse actions). Judge Proust, writing in *Garcia,* noted:

> In [*Spruill*], the court held that, when "a non-frivolous claim for relief has been asserted before the Board [in an Individual Right of Action (IRA) appeal, 5 U.S.C. § 1221(a) ], and the outcome is determined by whether the facts support that claim, a decision by the Board that they do not is a failure to prove the claim, not a lack of jurisdiction in the Board." The court opined that, in an IRA appeal, the Board should take jurisdiction based on a "well-pleaded complaint." The court recognized that this approach differed from that of *Cruz* where the court made clear that a non-frivolous constructive removal claim is not sufficient to establish jurisdiction.

*Garcia v. Dep't of Homeland Sec.,* at 1333 (quoting *Lloyd v. Small Bus. Admin.,* 96 M.S.P.R. 518, 522–23 (2004)) (citations omitted).

After reviewing the *Cruz* and the *Spruill* lines of cases, in *Garcia,* the Federal Circuit reaffirmed, en banc, the *Cruz* approach and specifically rejected *Dick v. Department of Veterans Affairs,* 290 F.3d 1356 (Fed.Cir. 2002), and *Dorrall v. Department of the*

---

4. The case may have been resolved on cross-motions for summary judgment due to RCFC 12(b), which provides that: "If, on a motion asserting the defense numbered [RCFC 12(b) ](6) to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in RCFC 56 ...." RCFC 12(b). In *Fisher v. United States,* 402 F.3d at 1176, however, the court stated that the proper motion in *Palmer* was under RCFC 12(b)(6), for failure to state a claim upon which relief can be granted.

*Army,* 301 F.3d 1375 (Fed.Cir.2002), as far as those cases conflicted with the *Cruz. See Garcia v. Dep't of Homeland Sec.,* at 1343. For example, in *Dick,* the court had stated "[t]he Board has jurisdiction over an appeal [alleging a constructive demotion] if the government employee makes non-frivolous allegations of jurisdiction supported by affidavits or other evidence." *Id.* (citing *Dick v. Dep't of Veterans Affairs,* 290 F.3d at 1361).

The Federal Circuit in *Garcia* was addressing a constructive reduction in grade, or possible "constructive adverse action." Although not at issue in *Garcia,* which is also distinguishable as an MSPB case, another example of a possible constructive adverse action provided by the Federal Circuit in *Garcia* was whether a resignation from employment was voluntary, or coerced and involuntary. *Id.* at 1324. The *Garcia* court stated that, once an MSPB claimant makes a non-frivolous claim of Board jurisdiction, the claimant nevertheless must prove jurisdiction by a preponderance of the evidence. *Id.* at 1344. "If the Board determines that the claimant fails to prove jurisdiction by a preponderance of the evidence, then the Board does not have jurisdiction and the case is dismissed for lack of jurisdiction," and not for failure to state a claim upon which relief can be granted. *Id.* at 1344.

> In other words, there is no part of jurisdiction that could be considered "technical" as if part of jurisdiction is only a technical concern without substantive impact. Jurisdiction is always a substantive concern, and if at any time a court determines that it lacks jurisdiction, it cannot decide the merits of the case. Rather, the court is limited to dismissing or transferring the case. *See Christianson v. Colt Indus. Operating Corp.,* 486 U.S. 800, 818, 108 S.Ct. 2166, 100 L.Ed.2d 811 (1988).

*Garcia v. Dep't of Homeland Sec.,* at 1340.

This court follows the voluntariness analysis of the *Carmichael* line of cases because they appear to deal more closely with the specialized issue of voluntary versus coerced separation from the military. But even if this court were directed to follow the *Fisher* and *Palmer* line of cases, and the plaintiff could satisfy a challenge to jurisdiction with non-frivolous allegations in a well-pleaded complaint, based on the record before this court, this plaintiff would not prevail either against an RCFC 12(b)(6) motion to dismiss for failure to state a claim, or an RCFC 56 motion for summary judgment, if the case were treated as a RCFC 56 motion for summary judgment pursuant to RCFC 12(b) because matters outside the pleadings were presented and not excluded.

■ Both the Federal Circuit and the Court of Federal Claims, and their predecessors, have repeatedly found that a decision to resign or retire is presumed to be voluntary. *Carmichael v. United States,* 298 F.3d at 1372; *Tippett v. United States,* 185 F.3d at 1255; *Schultz v. United States Navy,* 810 F.2d 1133, 1135–6 (Fed.Cir.1987); *Covington v. Dep't of Health and Human Servs.,* 750 F.2d 937, 941 (1984); *Christie v. United States,* 207 Ct.Cl. 333, 338, 518 F.2d 584, 587 (1975); *Moody v. United States,* 58 Fed.Cl. at 524; *Gavin v. United States,* 47 Fed.Cl. at 490; *Heaphy v. United States,* 23 Cl.Ct. 697, 700 (1991), *aff'd,* 972 F.2d 1355 (Fed.Cir. 1992) (table). A plaintiff, however, may rebut the presumption of voluntariness by presenting evidence to demonstrate that the resignation was offered under duress, caused by the government's coercive acts, or that the resignation was the result of government misrepresentation. *Carmichael v. United States,* 298 F.3d at 1372 (holding an otherwise voluntary discharge may be rendered involuntary if it is obtained as a result of wrongful government action such as duress or coercion); *Moyer v. United States,* 190 F.3d at 1320 (noting that a resignation is presumed to be voluntary, but can be rebutted by a showing of government misrepresentation); *Covington v. Dep't of Health and Human Servs.,* 750 F.2d at 941–42 (noting that "the decision must ultimately be the employee's decision, not the government's; whether the employee made an informed choice is the touchstone of our analysis.") (citing *Scharf v. Dep't of the Air Force,* 710 F.2d 1572, 1574 (Fed.Cir.1983)); *Roskos v. United States,* 213 Ct.Cl. 34, 39–40, 549 F.2d 1386, 1389–90 (1977); *Sinclair v. United States,* 66 Fed.Cl. at 492; *Gavin v. United*

*States,* 47 Fed.Cl. at 490; *Gallucci v. United States,* 41 Fed.Cl. 631, 638 (1998).

The Federal Circuit and its predecessor, the United States Court of Claims, have held that, in both civilian and military constructive discharge claims, to show duress, a plaintiff must demonstrate: "(1) that one side involuntarily accepted the terms of another; (2) that circumstances permitted no other alternative; and (3) that said circumstances were the result of coercive acts of the opposite party." *Christie v. United States,* 207 Ct.Cl. at 337–38, 518 F.2d at 587 (quoting *Fruhauf Sw. Garment Co. v. United States,* 126 Ct.Cl. 51, 62, 111 F.Supp. 945, 951 (1953)); *see also Carmichael v. United States,* 298 F.3d at 1372 (citing *Christie,* 207 Ct.Cl. at 338, 518 F.2d at 587). "Because this is not a disjunctive test, a plaintiff must establish all three elements for the exception to apply." *Nickerson v. United States,* 35 Fed.Cl. 581, 586 (1996), *aff'd,* 113 F.3d 1255 (Fed.Cir.1997) (table). Additionally, duress is measured objectively by considering all the facts and circumstances, not through an employee's subjective evaluation of a situation. *Carmichael v. United States,* 298 F.3d at 1372; *Christie v. United States,* 207 Ct.Cl. at 338, 518 F.2d at 587.

A voluntary decision to retire or resign is not rendered involuntary simply because the service member faced a difficult situation in which his choice was limited to one of two unpleasant alternatives. *Schultz v. United States Navy,* 810 F.2d at 1136–37; *Sammt v. United States,* 780 F.2d at 31–32 (stating in a military pay case, "we conclude as we have in civilian pay cases, that the exercise of an option to retire is not rendered involuntary by the imminent imposition of a less desirable alternative"); *Covington v. Dep't of Health and Human Servs.,* 750 F.2d at 942. The United States Court of Claims held in *Christie:*

> While it is possible plaintiff, herself, perceived no viable alternative but to tender her resignation, the record evidence supports CSC's [the Civil Service Commission's] finding that plaintiff chose to resign and accept discontinued service retirement rather than challenge the validity of her proposed discharge for cause. The fact remains, plaintiff had a choice. She could stand pat and fight. She chose not to. Merely because plaintiff was faced with an inherently unpleasant situation in that her choice was arguably limited to two unpleasant alternatives does not obviate the voluntariness of her resignation.

*Christie v. United States,* 207 Ct.Cl. at 338, 518 F.2d at 587.

If a plaintiff decides to resign or retire rather than face a justified government action, the decision is held to be voluntary. *See Christie v. United States,* 207 Ct.Cl. at 338–39, 518 F.2d at 588–89 (holding resignation in the face of justified disciplinary action for striking superior voluntary); *see also Sammt v. United States,* 780 F.2d at 32–33 (holding officer's decision to retire in the face of an impending involuntary retirement date mandated by statute voluntary); *Moody v. United States,* 58 Fed.Cl. at 525 (holding plaintiff's decision to resign rather than face a court-martial voluntary); *Brown v. United States,* 30 Fed.Cl. 227, 229–30 (1993) (finding no jurisdiction to review a claim for reinstatement, retroactive promotion, back pay, and allowances when the plaintiff resigned "for the good of the service" following a recommendation for trial by court-martial), *aff'd,* 26 F.3d 139 (Fed.Cir.1994) (table). But when a plaintiff's decision to retire or resign was the result of government action which was unjustified or contrary to its own regulations, rules or procedures, the decision was found to be involuntary. *See Carmichael v. United States,* 298 F.3d at 1372 (holding the government's failure to follow its own regulations may constitute coercive action sufficient to render a voluntary discharge involuntary), and on remand, *Carmichael v. United States,* 66 Fed.Cl. 115, 127–29 (2005) (in which the trial court granted summary judgment for the plaintiff after finding that the Navy's failure to follow its own religious accommodation procedures was not harmless error); *Schultz v. United States Navy,* 810 F.2d at 1136–37 ("If an employee can show that the agency knew that the reason for the threatened removal could not be substantiated, the threatened action by the agency is purely coercive."); *Roskos v. United States,* 213 Ct. Cl. at 39–40, 549 F.2d at 1389–90 (holding

that civil service employee's decision to retire in the face of wrongful reassignment and difficult relocation was involuntary).

■ In an effort to document her claim that her request for separation was involuntary, plaintiff alleged, in conclusory fashion, in her signed "Separation of Commissioned Officer" form that her "Reason for Separation" was "constructive discharge due to retaliatory deployment out of Alaska, wrongful conduct by IHS and Alaska Native Tribal Health Consortium employers." Similarly, her opposition to the defendant's motion to dismiss, stated that, "[s]he faced extreme duress in being wrongfully transferred out of the state of her home, her children, and her partner who had an established business in Alaska and was only licensed to practice there." Plaintiff also states in papers filed with the court that she "clearly did not voluntarily accept the government's terms"; she had "no alternative but to submit her separation papers"; and that "[s]he was placed in an untenable situation due to the coercive actions of officers who violated government laws and procedures." Allegations alone, however are insufficient. *See Briscoe v. LaHue,* 663 F.2d at 723. Plaintiff must bring forth relevant and competent proof in order to rebut the presumption of voluntariness. *See McNutt v. Gen. Motors Acceptance Corp. of Ind.,* 298 U.S. at 189, 56 S.Ct. 780; *Reynolds v. Army and Air Force Exch. Serv.,* 846 F.2d at 747. Accordingly, "the plaintiff bears the burden of coming forward with evidence to demonstrate that [her] resignation or retirement was not voluntary." *Carmichael v. United States,* 298 F.3d at 1372.

Addressing the third part of the duress test outlined above first, the key question is whether IHS's decision to reassign plaintiff to Gallup was unjustified or contrary to IHS regulations, rules or procedures. If the reassignment was unjustified or contrary to IHS regulations, rules or procedures then it might be considered coercive and plaintiff's subsequent separation might be rendered involuntary. If the agency failed to follow its own regulations, rules and procedures, the "trial court then must evaluate whether 'a reasonable employee confronted with the same circumstance would feel coerced into

resigning.'" *Carmichael v. United States,* 298 F.3d at 1376 (quoting *Middleton v. Dep't of Def.,* 185 F.3d 1374, 1379 (Fed.Cir. 1999)); *see also Roskos v. United States,* 213 Ct.Cl. at 39–40, 549 F.2d at 1389 ("Because that reassignment was invalid rather than proper, it represented an unjustifiable coercive action ....") (footnote omitted). If, however, the reassignment was permissible under IHS regulations, rules, and procedures, then plaintiff faced a difficult situation which rendered her choice as being one between unpleasant alternatives, and her decision to request separation was voluntary. *See Carmichael v. United States,* 298 F.3d at 1376; *Staats v. United States Postal Serv.,* 99 F.3d 1120, 1124 (Fed.Cir.1996); *Sammt v. United States,* 780 F.2d at 31; *Christie v. United States,* 207 Ct.Cl. at 338, 518 F.2d at 587. As stated by the Federal Circuit in *Staats:*

> [T]he doctrine of coercive involuntariness is a narrow one. It does not apply to a case in which an employee decides to resign or retire because he does not want to accept a new assignment, a transfer, or other measures that the agency is authorized to adopt, even if those measures make continuation in the job so unpleasant for the employee that he feels that he has no realistic option but to leave. As this court has explained, the fact that an employee is faced with an unpleasant situation or that his choice is limited to two unattractive options does not make the employee's decision any less voluntary.

*Staats v. United States Postal Serv.,* 99 F.3d at 1124.

In determining whether the decision to reassign plaintiff was justified, it is important to remember that "strong policy reasons compel courts 'to allow the widest possible latitude to the armed services in their administration of personnel matters.'" *Voge v. United States,* 844 F.2d 776, 782 (Fed.Cir. 1988) (quoting *Sanders v. United States,* 219 Ct.Cl. 285, 302, 594 F.2d 804, 813 (1979)), *cert. denied,* 488 U.S. 941, 109 S.Ct. 365, 102 L.Ed.2d 355 (1988). This court should not interfere with personnel decisions by the uniformed services, except to ensure that the decision maker has complied with applicable

law and established procedures set forth in its own regulations, rules, and procedures. *See Orloff v. Willoughby,* 345 U.S. 83, 94, 73 S.Ct. 534, 97 L.Ed. 842, *reh'g denied,* 345 U.S. 931, 73 S.Ct. 779, 97 L.Ed. 1360 (1953); *see also Fisher v. United States,* 402 F.3d at 1177; *Sargisson v. United States,* 913 F.2d 918, 921–22 (Fed.Cir.), *reh'g denied* (1990).

Plaintiff attempts to rely on *Carmichael v. United States,* 298 F.3d 1367, and *Roskos v. United States,* 213 Ct.Cl. 34, 549 F.2d 1386. In *Carmichael,* a service member in the Navy was denied reenlistment, but was honorably discharged. Mr. Carmichael alleged that he was involuntarily discharged after more than seventeen years of service. Plaintiff Carmichael alleged that his religious convictions were violated because the Navy identified him by his Social Security Number in the reenlistment contract, which he believed was the "Number of the Beast" discussed in the Bible, Book of Revelations, Chapter 13. Under these circumstances, he refused to sign his reenlistment contract. *See Carmichael v. United States,* 298 F.3d at 1370–71. The Navy denied Mr. Carmichael's request to change his identification number, pending change of his social security number, and did not treat the request as a religious accommodation request or address the Navy's religious accommodation policies. *Id.* at 1373–74. The Federal Circuit vacated the trial court's dismissal for lack of jurisdiction and remanded with instructions to determine whether the Navy had wrongfully failed to apply its own religious accommodation procedures as long as there was no adverse impact on military readiness. *Id.* at 1375–76. On remand, the trial court granted plaintiff's motion for summary judgment and awarded relief because the court found that the Navy had failed follow its own rules to consider religious accommodation requests and that the failure was not harmless error. *Carmichael v. United States,* 66 Fed.Cl. at 127–29. In contrast with the facts of *Carmichael,* as discussed more fully below, IHS followed its own applicable regulations, rules and procedures in reassigning plaintiff.

In *Roskos,* an IRS employee was notified of a proposed demotion and reassignment to another city. *See Roskos v. United States,* 213 Ct.Cl. at 36, 549 F.2d at 1387. The demotion ultimately was modified to a ten-day suspension. *Id.* Mr. Roskos retired, stating that the involuntary reassignment was detrimental to his health and family. *Id.* The grievance that Mr. Roskos had filed prior to his retirement continued and, although the suspension was reversed, the reassignment was held to be a proper exercise of the IRS District Director's authority. *Id.* at 36–37, 549 F.2d at 1387. The Civil Service Commission agreed. *Id.* at 37, 549 F.2d at 1387. On appeal, based on the facts of the *Roskos* case, the Federal Circuit held that the "instantaneous exile or isolation" reassignment of a civilian employee was not justified by the relatively minor nature of the alleged infraction. *Id.* at 39, 549 F.2d at 1388. Therefore, the court held that it "was not valid as a discretionary managerial determination, but was either an improper effort to pressure plaintiff to retire or was at the least an arbitrary and capricious adverse action." *Id.* at 39, 549 F.2d at 1389. Because the employee's retirement was the result of an invalid reassignment, the court held that the employee's decision to retire was rendered involuntary. *Id.* at 40–41, 549 F.2d at 1389–90.

Based on the record before this court, the facts of plaintiff's case are also distinguishable from those in *Roskos.* The IHS did not instantaneously transfer Dr. Colleen Murphy away from her family, but rather granted her over fifty days of extended leave time to accommodate her personal and familial needs. Of far greater significance, however, the plaintiff's reassignment was a lawful, administrative, personnel decision by superiors of a uniformed service, and, significantly, not a reassignment of a civilian employee. As noted above, this court is bound to give "the widest possible latitude to the armed services in their administration of personnel matters." *Voge v. United States,* 844 F.2d at 782 (quoting *Sanders v. United States,* 219 Ct.Cl. at 302, 594 F.2d at 813); *see also Orloff v. Willoughby,* 345 U.S. at 94, 73 S.Ct. 534. Moreover, plaintiff appears to have, and certainly should have understood, that, in accordance with her commission, she could be reassigned for the good of the service.

Regarding the issue addressed in *Carmichael* of whether IHS's decision to reassign plaintiff was in accordance with its own regulations, rules, and procedures, plaintiff specifically alleges two violations by IHS associated with her reassignment on which the court will comment briefly. First, plaintiff argues that the Alaska Area Native Health Service Director, Mr. Mandregan, improperly refused to authorize the proposed Memorandum of Agreement with the Alaskan Chugachmiut, which would have allowed plaintiff to remain in Alaska. Second, plaintiff argues that the IHS redeployment committee and IHS Field Operations Director Don Davis violated the Agency–Wide Redeployment Program by improperly assigning plaintiff to a hospital in Gallup, New Mexico, which she alleged had no need for her services. Although given the opportunity to do so, plaintiff has failed to support either allegation with relevant, competent proof. *See Reynolds v. Army and Air Force Exch. Serv.*, 846 F.2d at 747.

Plaintiff points to the pre–1996 IHS redeployment policy, in which transfer within the Public Health Service was normally a matter of physician's choice, as support for her claim that IHS singled her out in a retaliatory manner for an improper reassignment. In 1996, however, the IHS abandoned this policy to meet the changing budget and organizational needs of the agency and issued Circular No. 96–08, which established the Agency–Wide Redeployment Program, and included the following language:

> The redeployment of IHS personnel has previously been informal, relying primarily on voluntary cooperation and special arrangements between all the individuals involved. Reluctance or any indication of objection by a Receiving Area or the affected personnel was sufficient to void the reassignment or transfer. The IHS has reached a point in its organizational life that voluntarism is insufficient, ineffective, and not meeting the emerging challenges and forces facing the agency.

According to the new IHS redeployment policy, future redeployment decisions would "be based on the needs of the IHS and, whenever possible and practicable, the de-

sires of individual employees." This revised 1996 policy was operative at the time of plaintiff's 1999 reassignment to the IHS hospital in Gallup, New Mexico. The revised IHS Circular, however, did require that any redeployment request by an Area Director of Headquarters Operations must "include a certification that all attempts to place the employee(s) within the Area or Headquarters have been fully exhausted, and that there are no fundable vacancies that fit the qualifications of the employee(s) affected."

On March 26, 1999, the Director of the Alaska Area Native Health Service, Christopher Mandregan, sent a letter to the IHS's Director of Field Operations, Don Davis, stating,

> I certify that I have exhausted all attempts to find a suitable assignment for Captain Murphy within the Alaska Area. I also certify that the Alaska Area Office is at residual strength and that no fundable vacancies exist under the control of the Alaska Area Native Health Service that fit the qualifications of Captain Murphy.

Plaintiff objected, but on May 13, 1999, Mr. Davis rejected plaintiff's grievance and informed plaintiff that she was being reassigned to the IHS hospital in Gallup, New Mexico, because she was without a contract in Alaska, there were no fundable vacancies in the Alaska Area IHS, and based on IHS's needs for an officer of her credentials in Gallup. Mr. Davis also reminded plaintiff, "[p]lease be clear, there is no IHS position/billet in Anchorage, Alaska to which you could be reassigned. If there were, your directed reassignment to the Gallup Indian Medical Center would not be taking place."

Although plaintiff has provided no competent proof to challenge the conclusions of Mr. Mandregan or Mr. Davis, plaintiff alleges that IHS officials did not make any attempt to find a position for her in Alaska. Plaintiff points to her proposed position with the Chugachmiut as evidence that IHS could have reassigned her in Alaska in accordance with the goals of the Area–Wide Redeployment Policy. The plaintiff's own submissions, however, demonstrate that Mr. Mandregan considered the appropriateness of the Chugachmiut position and concluded, "given the

need for OB/GYN physicians within the IHS health service delivery system and the scope of practice at Alaska Women's Health Services, I do not consider the proposed assignment a suitable one for a PHS Commissioned Officer." Mr. Mandegran specifically cited three unresolved concerns: shortages of Ob/Gyns at four IHS hospitals, the fact that the Chugachmiut agreement would require plaintiff to spend only 30 percent of her time with the intended beneficiaries and that the majority of her time would be spent serving non-beneficiaries in a private sector facility, and concerns that the Federal Tort Claims Act would not cover the remaining 70 percent of plaintiff's work. These concerns identified by Mr. Mandregan demonstrate that he exercised his discretion reasonably and in accordance with IHS rules and guidelines when he denied plaintiff's request to remain in Alaska with the Chugachmiut.

Additionally, plaintiff alleges that Mr. Davis and the IHS review board violated IHS guidelines by assigning her to Gallup, where, plaintiff alleges, there was no need for her services. In support of this allegation, plaintiff argues that the IHS website did not advertise a need for an Ob/Gyn in Gallup at the time of her reassignment, that, during her four weeks in Gallup, there was little for her to do and that she was forced to fill in as a physician's assistant. Even assuming, for the purpose of defendant's motion to dismiss, the truth of these two allegations, they do not demonstrate the reassignment to be a violation of the Agency–Wide Redeployment Program, which required decisions to be "based on the needs of the IHS and, whenever possible and practicable, the desires of individual employees." The absence of an advertisement for required Ob/Gyn services is not dispositive on whether or not the need existed. Moreover, plaintiff has provided no evidence of her alleged underutilization during the four weeks she was in Gallup beyond her bald allegation, nor is four weeks sufficient time during which to make an adequate assessment of the medical needs in Gallup by a newly arrived employee, particularly one who had indicated she was not interested in remaining in Gallup beyond those four weeks.

Finally, plaintiff has made many allegations regarding an alleged conspiracy by IHS officers in Anchorage to have plaintiff excluded from practicing at the ANMC, following her reporting of Dr. Neil Murphy to higher authorities. Plaintiff, however, has not provided competent proof to support the claim that the IHS review board, which recommended plaintiff's reassignment, or the officials who subsequently upheld the reassignment on appeal, were part of a conspiracy against her. In fact, plaintiff has failed to provide proof that any of the officials who made or upheld the decision to reassign plaintiff to Gallup, New Mexico, violated IHS regulations, rules or procedures, or acted outside their authority.

Furthermore, the regulation in place in 1982 when plaintiff took her oath of office is the same as when plaintiff submitted her separation papers, and remains the same today. That regulation states that "[o]fficers shall be appointed only to general service and shall be subject to change of station." *See* 42 C.F.R. § 21.33 (2005). Moreover, plaintiff signed an oath that stated: "I am willing to serve in any area or position or wherever the exigencies of the Service may require." On April 29, 1999, six weeks before plaintiff submitted her separation papers, Captain Denise Canton, Chief Legal Advisor for the Division of Commissioned Personnel, in response to a letter sent by plaintiff to the Surgeon General, reminded plaintiff's counsel that:

> Pursuant to title 42 U.S.C. 204 et seq. and 42 CFR Part 21, Commissioned Officers, as members of a uniformed service, are appointed to general duty and subject to reassignment to meet the needs of the service. Therefore, reassignments, including those requiring geographic relocation, are not considered adverse personnel actions.... Although the transfer may present some personal inconveniences for CAPT Murphy, there is no evidence that this transfer will present a greater hardship than normally associated with active-duty service in a Uniformed Service.

Given the authority of the IHS to reassign plaintiff in the interests of the service, combined with plaintiff's signed oath of office

and understanding that she was bound to serve in any area where the needs of the service required, as well as the unrebutted evidence that there were no suitable IHS positions available in Alaska, plaintiff has failed to show that the reassignment was either unjustified or in violation of IHS authority under its regulations, rules or procedures. Because the plaintiff's redeployment was in accordance with IHS regulations, rules and procedures, plaintiff has failed to demonstrate that the reassignment was the result of coercive acts by IHS which would have rendered her decision to seek separation involuntary.

Turning to part two of the applicable duress test identified above, the availability of alternatives, the pleadings show that plaintiff had several reasonable alternatives at the time she submitted her request for separation. Plaintiff could have accepted the reassignment to Gallup for the final three years of her service contract; she could have continued to serve in Gallup while her appeal continued; and she could have sought reassignment to another Public Health Service approved facility. Indeed, IHS officials advised plaintiff of these options on several occasions. But, like the plaintiff in *Christie v. United States,* Dr. Colleen Murphy chose to separate rather than pursue any of these options. In *Christie,* the United States Court of Claims found that:

> plaintiff chose to resign and accept discontinued service retirement rather than challenge the validity of her proposed discharge for cause. The fact remains, plaintiff had a choice. She could stand pat and fight. She chose not to. Merely because plaintiff was faced with an inherently unpleasant situation in that her choice was arguably limited to two unpleasant alternatives does not obviate the voluntariness of her resignation.

*Christie v. United States,* 207 Ct.Cl. at 338, 518 F.2d at 587.

Although the relocation of plaintiff's family to Gallup may have been an unattractive and challenging alternative for plaintiff and her family, and plaintiff may have felt that she had received poor treatment after reporting a colleague, the available options alternative to requesting separation are sufficient to render her resignation voluntary. Plaintiff decided to request early separation even before arriving in Gallup, before her appeal process was exhausted, and without seeking reassignment elsewhere in the Public Health Service. Because plaintiff had alternatives to requesting separation, she has failed to satisfy the second prong of the duress test, "that circumstances permitted no other alternative." *See Christie v. United States,* 207 Ct.Cl. at 337–38, 518 F.2d at 587 (quoting *Fruhauf Sw. Garment Co. v. United States,* 126 Ct.Cl. at 62, 111 F.Supp. at 951).

Regarding the remaining part one of the duress test, whether one party involuntarily accepted the terms of the other, in plaintiff's June 11, 1999, letter to the IHS, Dr. Murphy stated: "I have an excruciatingly painful career decision to make .... It is with utter regret and deepest sorrow that I am now forced to submit my separation papers." She also indicated that she would withdraw her request for separation if she could remain in Alaska. These statements demonstrate that plaintiff made a knowing voluntary, albeit for her, difficult career decision to separate rather than to relocate to New Mexico. A choice is not rendered involuntary simply because it is made between two unattractive alternatives. *See Sammt v. United States,* 780 F.2d at 31. Therefore, plaintiff has failed to satisfy the first prong of the duress test, "that one side involuntarily accepted the terms of another." *See Christie v. United States,* 207 Ct.Cl. at 337–38, 518 F.2d at 587 (quoting *Fruhauf Sw. Garment Co. v. United States,* 126 Ct.Cl. at 62, 111 F.Supp. at 951).

In order to establish involuntariness through duress, a plaintiff must satisfy all three prongs of the duress test. In the case before the court, plaintiff has failed to satisfy any part of the duress test. In sum, plaintiff has failed to offer competent proof sufficient to rebut the presumption that her request for early separation from the Public Health Service Commissioned Corps was voluntary. Although plaintiff alleged that coercive behavior on the part of her fellow officers in Alaska had led to what she described as her involuntary resignation, the record before

the court, including plaintiff's complaint, documents she submitted, and her own written statements, demonstrate that she requested separation because she did not want to comply with her lawful reassignment. Plaintiff does not deny that she was offered a position as a Public Health Service Physician at the same rate of pay, although not in the location of her choice. Moreover, throughout the time she was able to remain in Alaska, despite what she alleges were adverse working conditions for a substantial period of time prior to her transfer, Dr. Colleen Murphy did not submit a separation request. Only after it became clear that no positions were available in Alaska did plaintiff request separation. Moreover, even after years of working in an allegedly intolerable work environment, plaintiff candidly admitted that she would "gladly retract" her separation request if IHS allowed her to remain in Anchorage, Alaska, even though still in close proximity to the same officers who allegedly created the intolerable work environment. After reviewing the record, this court concludes plaintiff's request for separation from the United States Public Health Service was voluntary.

## CONCLUSION

For the foregoing reasons, defendant's motion to dismiss for lack of subject matter jurisdiction is, hereby, **GRANTED**, and plaintiff's complaint is **DISMISSED**, with prejudice. The clerk's office is directed to enter **JUDGMENT** in accordance with this decision.

**IT IS SO ORDERED.**